**People of the State of Illinois, Defendant in Error, v. John Peterson and Glenn Cherry (Impleaded), Plaintiffs in Error.**

Gen. No. 48,511.

First District, Second Division.

January 30, 1962.

Rehearing denied February 11, 1962.

Richard H. Devine, of Chicago, for plaintiffs in error.

Daniel P. Ward, State's Attorney of Cook County (John T. Gallagher, Rudolph L. Janega, Louis B. Garippo, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE BRYANT delivered the opinion of the court:

This is a writ of error to review the conviction of defendants, John Peterson and Glenn Cherry, for the crime of conspiracy to obstruct the administration of public justice. Defendants were indicted by the Grand Jury of the Criminal Court of Cook County on March 25, 1960, and subsequently tried. Verdicts of guilty were returned by the jury on December 6, 1960, and the jury fixed the punishments at nine months in the County jail for Peterson and a $500 fine for Cherry. Judgment was entered on the verdicts.

Defendants' theory of the case on appeal is that they were deprived of a fair and impartial trial by the court's failure to strike the testimony of an accomplice witness, who refused to answer many questions on cross examination, and that defendants were not proven guilty beyond a reasonable doubt.

Defendant Peterson was a police officer and defendant Cherry was a detective at the time of the conspiracy. Both were assigned to the Summerdale Station. The accomplice witness whose testimony served as the primary basis for their conviction was

Richard Morrison, a co-defendant, but not on trial with the defendants. The conspiracy concerns the substitution of one polaroid camera (People's Exhibit 4) and film for another polaroid camera (People's Exhibit 7) and film, the latter having been burglarized by Richard Morrison and Gerald Bossuyt from an auto agency at 3000 Lawrence Avenue on April 14, 1959.

Morrison testified on direct examination during the trial of the instant case that he had committed the burglary of April 14, and had taken a polaroid land camera Model 110, a polaroid copying machine, 9 bottles of whiskey, a radio, and about $30 in change. He was arrested shortly thereafter and taken to the Summerdale Station where he was questioned. Several hours later Morrison saw Peterson at the station. They had a conversation during which Peterson offered to help Morrison if he could. Peterson admitted talking to Morrison at this time under orders from Captain Dorf to ascertain whether the property Morrison had in his car at the time of his arrest had been burglarized. However, he denied the offer of help and all the other implicating testimony of Morrison. After this conversation Morrison was placed in the lockup and shortly thereafter he asked to talk to Peterson again. Morrison further testified that Peterson then told him that he had talked to Captain Dorf and that it would cost him money to get out but that they would book him on a disorderly conduct charge. Although Peterson was neither the arresting officer nor the investigating officer in Morrison's arrest, he then ordered Morrison booked on disorderly conduct. Morrison testified that he gave Peterson $200 for this favor, $100 for himself and $100 for Captain Dorf.

Morrison further testified as follows: He called Peterson at the station on April 15 and said that police officers told him there was a way his case could be fixed if they could switch the camera. Peterson said that the first thing to do is make your bond and

then just stay in hiding until I figure out what to do. Several days later Morrison saw Peterson at the Atlas Bail Bond Company and Peterson drove him to the Summerdale Station. On the way to the station there was a conversation and Peterson suggested that the property could be switched if Morrison could get another camera and receipt.

After a call by Morrison to Peterson a few days later, they met at Damen and Balmoral where Peterson gave him the numbers and description of the polaroid camera. Peterson said that the best time to switch would be before court time and that he would have to cut the Captain in. He said that two bills would handle Captain Dorf. Morrison agreed and also told Peterson that he could have the camera, liquor and money taken from his car and that this would amount to about $500.

Morrison testified that the first time he saw People's Exhibit 4, the substituted camera, was on May 4, 1959, when he obtained this camera and a receipt from Neal Cole. Then he drove to Bossuyt's home where they took several pictures until they got a picture of Morrison standing next to a television set with a dark background. The next day Morrison saw Peterson and gave him the camera, picture, and $200. The night following this exchange they met at the Granville El station and Peterson handed him the camera that had been in custody since the burglary. Morrison looked at the serial number and it was a different camera than the one he had given Peterson the night before.

At the ensuing Felony Court hearing on Morrison's case, Morrison stated that the camera was his property and produced a receipt for it. When the camera was opened revealing Morrison's picture, Mr. Sakol, who had testified previously that the camera was his and had been stolen from him, screamed that there was something phony here because that was his camera

at the station. Morrison was then held to the Grand Jury on the burglary charge.

Morrison saw Peterson at the Club Laurel a week later and told him what happened in his case. About June 8th or 9th he saw Glenn Cherry at the Club Laurel and thanked him for exchanging the camera. Cherry was surprised that Morrison knew about this, whereupon Morrison told him that Cherry's ex partner, Burt Kann, told him about it.

Morrison subsequently sold the returned camera to a mechanic named George. George Yamomoto testified that he received a camera from Morrison early in May, 1959, in payment for a repair bill and that he gave the camera to Assistant Public Defender Doherty later that year. In this respect the testimony of Morrison was corroborated, as it also was in certain other details such as the admissions by Peterson that he had ordered Morrison booked on disorderly conduct and that he had picked him up at the Atlas Bail Bond Company. As to the content of their conversations and the agreement to switch evidence, however, the testimony of Morrison was denied by both Peterson and Cherry.

One other aspect of the case lends credence, if not actual corroboration, to Morrison's testimony. The property from the burglary of April 14 was received in the custodian's office on April 20, 1959. Michael Milligan testified that it was his duty to examine each item of inventoried, recovered property and to get serial numbers, but all he did was initial the inventory sheet. John Corcoran, whom Milligan asked for help in finding the serial number on the original camera, admitted that he placed the serial number on the inventory slip but could not remember when he did it. Nor could Lyle Curry, who also helped to find the serial number, remember the date. Also on the inventory slip was the notation "one officer", which Corcoran denied writing and stated that it was writ-

356

ten by Milligan. And Morrison testified that Peterson had told him that it was possible to switch cameras because there were no numbers on the inventory sheet which was sent to the custodian.

In one important respect defendant Cherry was impeached. Cherry testified that on May 5, 1959, Officer Handley told him that he, Handley, was not on duty the following day, May 6, and that Handley asked Cherry to save him a trip by picking up the property involved in the Morrison case from the custodian's office and delivering it to his home since he needed it in court on May 7. However, Officer Handley testified that he had worked on May 6, and that Cherry on that day had offered to get the evidence for him.

Great latitude was permitted defense counsel in cross examination of the accomplice witness, Morrison. The trial judge permitted cross examination which showed Morrison's bias, interest, prejudice, hostility to his co-defendants, and promise or possible hope of reward. These matters went to the possible impeachment and credibility of the witness, and let the jury know exactly what type of witness was testifying. It showed his activities, motives and interest in the case. Morrison admitted his guilt in the crime charged, although he said he was not testifying to avoid going to the penitentiary; admitted he had been a perjurer; admitted that he had informed on policemen because he wanted to save himself and that he was given treatment by the State's Attorney which was not that of an ordinary prisoner; and admitted that he gave $500 to another policeman, Burton Kann, so that Kann would not stop the camera switch.

Defendants cite Lowry v. Chicago & N. W. R. Co., 248 Ill App 306, for the proposition that if a witness refuses to answer pertinent questions on cross examination his testimony on direct examination should be stricken. That case was a civil action for personal

injuries in which plaintiff simply refused for no stated reason to answer further questions on cross examination, and the trial court struck plaintiff's direct testimony because defendant had been deprived of his right to a full and complete cross examination. We fail to see how that case provides any authority for appellants' position in this appeal because that case does not deal with a co-defendant's constitutional right against self-incrimination, and the record in the instant case shows clearly that defendants had a full and complete cross examination. Most of the questions on cross examination dealt with Morrison's involvement in other criminal activities. Although not directly pertinent to the present conspiracy, the trial judge nevertheless allowed defense counsel a very broad scope in testing the credibility of the witness and attempting to impeach him. The record also reveals that Morrison responded with factual, and sometimes extensive, answers on cross examination, except for the specific refusals to incriminate himself. It is ironical that defendants now complain of the accomplice's exercise of a constitutional right since it was the defense counsel who suggested that the trial judge warn the accomplice of his rights before he took the stand.

Defendants' citation to People v. Nachowicz, 340 Ill 480, 172 NE 812, also fails to sustain their argument. An examination of that case on the relevant point reveals the following language, at page 493:

> "If the witness consents to testify to one matter tending to criminate himself he must testify in all respects relating to that matter so far as material to the issues. If he waives the privilege he does so fully in relation to that act, but he does not thereby waive his privilege of refusing to reveal other unlawful acts wholly unconnected with the act of which he has spoken, even though they may be material to the issue."

In People v. Neukom, 16 Ill2d 340, at 346, 158 NE2d 53, the Illinois Supreme Court stated:

"The testimony of an accomplice is to be received with suspicion and acted upon with caution. Such considerations go to the weight of the evidence and the credibility of the witness. However, a conviction may be based upon such testimony, even if uncorroborated, if it is of such a character as to convince the jury beyond a reasonable doubt of the guilt of the accused. If the jury is so satisfied by the testimony of an accomplice, the judgment should not be set aside unless it is plainly apparent to the reviewing court that the defendant was not proved guilty beyond a reasonable doubt. (People v. Niemoth, 409 Ill 111; People v. Nitti, 8 Ill2d 136.)"

Considering the entire record, we cannot say that the defendants were not proved guilty beyond a reasonable doubt. Defendant Cherry was impeached on one important statement as noted above, and Morrison's testimony was corroborated in some material respects. As stated in People v. Baker, 16 Ill2d 364, at 370, 158 NE2d 1:

"While it has been observed in such cases that the testimony of an accused is entitled to as much weight as that of an accomplice (People v. Harvey, 321 Ill 361,) it is also the rule that material corroboration of the testimony of either is entitled to great weight. (People v. Hermens, 5 Ill2d 277; People v. Durand, 321 Ill 526.)"

The judgment is affirmed.

Judgment affirmed.

FRIEND, P. J. and BURKE, J., concur.