THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANIEL ACCARDO, Defendant-Appellant.

Second District   No. 2—89—0185

Opinion filed March 14, 1990.—Rehearing denied April 12, 1990.

Carl P. Clavelli, of Schiller Park, of appellant.

Fred L. Foreman, State's Attorney, of Waukegan, and John Thomas Moran, of Law Offices of John Thomas Moran, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Daniel Accardo, was charged with unlawful possession and delivery of more than 500 grams of cannabis. (Ill. Rev. Stat. 1987, ch. 56½, pars. 704(e), 705(e).) Accardo was found guilty after a

bench trial and sentenced to a four-year term of imprisonment. Accardo appeals, claiming four instances of error: (1) evidence of taped conversations was admitted in violation of the Illinois eavesdropping statute; (2) Accardo's right to confrontation was violated when the State failed to disclose an informant's written statement and failed to reveal the details of the agreement reached between the State and the informant; (3) Accardo's right to confrontation was violated when a witness for the State was allowed to invoke his fifth amendment rights during cross-examination; and (4) Accardo's affirmative defense of entrapment was not refuted beyond a reasonable doubt.

In October 1984, Lonnie Maret, the informant, was arrested in Stillwater, Oklahoma, and charged with unlawful distribution of cocaine. Maret, in an attempt to work out a deal, was introduced to Grady Lowrey, an agent with the Oklahoma Bureau of Narcotics and Dangerous Drugs. Maret agreed to act as an informant against Accardo and Timothy O'Leary, both Illinois residents, if Lowrey could arrange some consideration on his pending drug charge. Maret told Lowrey that he had purchased a total of 30 to 50 pounds of cocaine and a large quantity of marijuana from the two men throughout the past several years. Maret revoked his offer to act as an informant when Lowrey indicated the prosecutor would not afford Maret any consideration. Lowrey did not prepare any reports of these discussions. Maret was convicted in October 1986 and received a three-year sentence with all but the first six months suspended.

On February 8, 1988, Maret was found to be in possession of a small amount of cocaine by a local chief of police, Mike Devlin. Again, Maret offered to act as an informant in exchange for consideration on the State's part. Devlin transported Maret to Tulsa, Oklahoma, to meet with Lowrey. Lowrey learned that Maret was on probation at the time for his prior conviction and would receive a "total pass" in this instance if he cooperated. However, there is nothing in the record to indicate that the local prosecutor was ever contacted or consulted as to this arrangement.

Maret again gave Lowrey the names of Accardo and O'Leary, although he indicated that he had not been in close contact with or purchased drugs from them since 1984. Maret placed phone calls to both O'Leary and Accardo from Lowrey's office on February 10, 1988. These calls were tape-recorded. Throughout the next six weeks, several more phone calls were made to Accardo from Maret and Lowrey. These calls were also recorded.

An agreement was reached in which Accardo agreed to sell Maret and Lowrey 55 pounds of marijuana for approximately $67,000. Maret

and Lowrey traveled to Lake County, Illinois, on March 28, 1989, and contacted Accardo. The three men met, and on March 30, Accardo gave the marijuana to Lowrey. Accardo was then placed under arrest. The Lake County officials were first notified on the following day, and they charged Accardo with unlawful possession and delivery of more than 500 grams of cannabis.

The case proceeded to trial on November 14, 1988. After brief opening statements, the State called Lowrey as its first witness. Lowrey testified that Devlin brought Maret to him on February 10, 1988. Maret placed a phone call to Accardo on this date and the call was recorded.

At this point in the testimony, Accardo filed a motion *in limine* seeking to exclude from evidence any reference to the substance of the taped conversations. Accardo alleged that the tape recordings were made in violation of the Illinois eavesdropping statute and, therefore, evidence contained on the tapes was inadmissible. The court denied the motion, finding that there was no collusion between Oklahoma and Illinois authorities and the Oklahoma authorities were in compliance with Oklahoma law. Accardo was permitted to lodge a continuing objection to the testimonies of Lowrey and Maret on the basis that the recorded evidence was obtained in violation of Illinois law. A total of seven tapes were admitted into evidence.

On cross-examination, Lowrey stated that when he and Maret came in contact on February 10, 1988, Maret again offered to set up a drug deal with Accardo and O'Leary. It was Lowrey's understanding that Maret had been detained for possession of cocaine and that Devlin had reached an agreement with the local prosecutor in which Maret would receive a "total pass" on the possession of cocaine if he agreed to cooperate. Lowrey testified that he did not know if Devlin had formally arrested Maret prior to bringing him to Tulsa. Lowrey did not inquire as to whether Maret was in custody at the time. Lowrey was informed that Maret was still on probation at the time he was found to be in possession of cocaine. Lowrey did not check with any prosecuting official to determine if Maret's probation violation would be excused in exchange for his cooperation.

Lowrey testified that the Oklahoma Bureau of Narcotics and Dangerous Drugs has a written policy regulating its activities with informants. The policy calls for an in-depth interview to be conducted with the informant and a "history sheet" to be prepared and signed by the informant. Lowrey initially testified that he prepared the statement but forgot to bring it with him. He later stated that he doubted if there was a written history taken.

Lowrey acknowledged that the policy requires all pertinent information to be recorded and forwarded to headquarters. Lowrey admitted that his April 8, 1988, report did not contain the detailed information required by the policy, and he characterized these omissions as administrative errors. Lowrey's report was prepared from notes that he had kept throughout the investigation, and the notes were discarded when the report was typed. The report detailed the substance of the various telephone contacts between Maret, Lowrey and Accardo. Lowrey admitted that "all of the information is not in that report." Accardo reiterated his request to discover the notes and reports of interviews and any promises of leniency made in exchange for Maret's cooperation.

Lowrey testified that the informant policy also requires the cooperating individual to disclose all his knowledge of criminal activity. Lowrey admitted that it would not surprise him if Maret had withheld information concerning his knowledge of illegal activity. Lowrey testified that Maret gave him several names of people who were involved in drug dealing. Lowrey did not give those names to local police and threw away the notes containing these names. Lowrey did not prepare a report containing this information, and the only names that Lowrey could remember were Accardo and O'Leary. Lowrey testified that he did not ask where Maret had purchased the cocaine he possessed when stopped by Devlin. Lowrey testified that it was his understanding that Maret was never "arrested" for possession of cocaine in 1988, and Maret's probation officer was never notified of the probation violation.

Maret testified concerning his relationship with Accardo and O'Leary. He stated that he had purchased approximately one ton of marijuana and 25 to 30 pounds of cocaine from the two men during the early 1980s.

On cross-examination, Maret admitted to having an alcohol and drug problem until his arrest in 1984. Maret testified that it was at this time he stopped dealing in drugs. Maret admitted he was arrested on February 8, 1988, for being in possession of a small amount of cocaine. Maret also admitted that he was on probation at the time for his 1986 drug conviction. Maret knew that a condition of his probation was to abstain from using or possessing unlawful substances and to avoid places where they are used or sold. Maret denied that his drug problem was such that he could not abstain even while on probation. The following exchange occurred:

"Q. Well, you were aware that one of the conditions of your drug conviction and sentence were [sic] to abstain from using

any unlawful substances?

A. Yes.

Q. You were unable to do that, is that right?

A. I'd like to say that there's—who says I was using it? I mean—.

Q. So you deny you were using cocaine in 1988?

A. I am going to stand on my 5th amendment on that.

Q. Mr. Maret, you use drugs—when was the last time you used drugs?

MR. SCHOSTOK: Objection.

* * *

THE COURT: Objection sustained.

MR. CLAVELLI: Well, I move to strike this witness's testimony then."

During the ensuing discussion outside the presence of the witness, the court opined that Maret had the right to remain silent. The court admonished Maret that he had the right "not to answer questions that you feel may tend to incriminate you. That's your right." The court also chose not to strike Maret's testimony as a result of his exercise of his right. When questioning resumed, Maret denied being arrested in February 1988.

Maret testified that the car he was driving on February 8, 1988, was stopped by Devlin. Maret and his two passengers, Rick and Connie Sindorf, were each in possession of cocaine and were taken to the Perry County police station, where Maret was detained for four hours. Maret stated that Devlin knew him from the 1984 investigation, which led to his arrest and conviction, and Devlin knew that Maret was on probation at the time.

Maret reached a deal with Devlin in which Maret would cooperate, and no charges would be brought against him for the cocaine possession. Devlin told him that it would be "like it never happened." When Maret filed his monthly probation report for February 1988, he indicated to his probation officer that he was stopped for "failure to signal a lane change" and received a "verbal warning." He made no mention of his cocaine possession. Maret testified that Devlin specifically told him he did not have to report his possession of cocaine to his probation officer. There is no evidence that the local prosecuting attorney was ever consulted as to this arrangement. When asked if he had violated the conditions of his probation, Maret again resorted to his fifth amendment privilege and refused to answer. A side-bar conference followed during which the court held that it was inappropriate to require Maret to admit that he knew he had violated a condition of

his probation. The court sustained the State's objection made after Maret had invoked his constitutional privilege.

Maret was then questioned concerning his 1986 conviction of distribution of cocaine. Maret testified that he submitted an application for a suspended sentence. In the application, Maret agreed to provide information and to cooperate with his probation officer. He met with the officer on several occasions and claimed to have cooperated with her as directed. When asked if he admitted to her that he had committed the offense with which he was charged in 1984, Maret replied that it was "obvious he had dealt drugs. Yes." When the answer was stricken as not responsive, he replied that he did not know "if I ever admitted to her or not that I had sold the drugs." When asked if the statement contained in the presentence investigation report that he was "offered an opportunity to cooperate and refused" was true, Maret testified that it was. Follow-up questions were curtailed when the State objected, claiming Maret had "no duty to admit anything." The court sustained the objection. The court refused to admit into evidence either the application for a suspended sentence or the presentence investigation report.

Maret testified that he was present and heard everything said by his attorney on his behalf at the October 3, 1986, sentencing hearing. The State objected to any cross-examination concerning Maret's attorney's statements at his sentencing hearing. An offer of proof detailed several of Maret's lawyer's statements at the sentencing hearing, which directly contradicted Maret's testimony in the case at bar. Maret's attorney told the sentencing judge that Maret was a plumber and not a big drug dealer. These arguments prompted the sentencing judge to remark that he had a problem concluding that Maret was the large drug dealer the prosecutor had claimed. Maret received a three-year sentence with all but the first six months suspended. Though Accardo argued that he should be permitted to cross-examine Maret with the statements made by his attorney in his previous prosecution, the objection was sustained on the basis that the statements were not made by Maret himself.

Maret claimed to have disclosed to Lowrey all his knowledge about drug dealing in Oklahoma as part of his cooperation, including the names of approximately six people. Maret stated that, at the conclusion of the two- or three-hour interview with Lowrey, he was sure he signed a statement, which he himself had prepared concerning his activities.

Maret refused to answer questions about his personal drug purchases. The following exchange occurred:

"Q. Did you give him names of other people whom you have purchased drugs from?

A. I gave him names of people that I believed were probably still in the drug business.

Q. Well, Mr. Maret, let's quit skirting the issue. Did you give him names of people you purchased drugs from?

A. I am going to have to stand on my 5th Amendment."

Accardo testified that Maret had previously informed him of Maret's arrest in 1984 for selling cocaine. Subsequent to 1984, Accardo spoke to Maret only a couple of times a year until February 1988. Accardo testified that there were many phone conversations between himself and Maret other than the seven recorded by Lowrey. Accardo testified that Maret called him and implored him to sell a large quantity of drugs. Maret indicated that he owed some people a large sum of money and, unless he arranged a drug transaction for these people, they would harm him and his family. Accardo stated that he agreed to the drug transaction only when it appeared that the lives of Maret and his family were in danger.

At the close of evidence, the court found Accardo guilty of the offenses charged. A hearing was subsequently held, and Accardo was sentenced to four years' imprisonment. The court denied Accardo's post-trial motion, and he appealed.

Defendant contends that the court erred by admitting into evidence the tape-recorded phone conversations. Defendant argues that these conversations were recorded in violation of the Illinois eavesdropping statute. Therefore, the tapes should not have been allowed into evidence.

The Illinois eavesdropping statute provides:

"A person commits eavesdropping when he:

(a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all of the parties to such conversation or (2) with the consent of any one party to such conversation and in accordance with Article 108A of the 'Code of Criminal Procedure of 1963' ***." (Ill. Rev. Stat. 1987, ch. 38, par. 14—2(a).)

Article 108A provides:

"The State's Attorney may authorize an application to a circuit judge for, and such judge may grant in conformity with this Article, an order authorizing or approving the use of an eavesdropping device by a law enforcement officer or agency having the responsibility for the investigation of any felony under Illinois law where any one party to a conversation to be

monitored *** has consented to such monitoring." (Ill. Rev. Stat. 1987, ch. 38, par. 108A—1.)

Evidence obtained in violation of this provision is inadmissible. Ill. Rev. Stat. 1987, ch. 38, par. 14—5.

It is uncontradicted that the directives of the Illinois statute were not complied with in making the tapes. While there was consent by one party to the conversations, there was never an application to and approval by a circuit court judge. Nevertheless, the State maintains that the tapes are admissible because they were obtained in conformity with Oklahoma and Federal statutory provisions. See Okla. Rev. Stat. 1987, ch. 13, par. 176.4; 18 U.S.C. §2511(2)(c) (1987).

The issue is whether evidence gathered by foreign State law enforcement officials as a result of eavesdropping, which conforms to the foreign State's statutory requirements but not with the Illinois eavesdropping statute, can be used against the defendant in an Illinois proceeding.

In *People v. Fidler* (1979), 72 Ill. App. 3d 924, Federal officers conducted a search pursuant to a Federal search warrant. The warrant was obtained as a result of electronic eavesdropping which conformed to Federal constitutional and statutory requirements but was in violation of the Illinois statute. The trial court suppressed the evidence. This court, in reversing the trial court, stated:

> "The purpose of the exclusionary rule is to deter law enforcement officers from violating the constitutional rights of citizens by removing the incentive for disregarding such rights. [Citation.] The suppression order in this case did not serve this end, however, since the actions of the Federal postal authorities, pursuing a wholly Federal investigation, were entirely lawful, and the record contains no hint of collusion between Federal and State authorities seeking to avoid the limitations of the Illinois Eavesdropping Statute. The only result of the entry of the suppression order in this case is that it prevents highly probative evidence from being available to the finder of fact in a criminal trial. In our view, the order constituted an unwarranted extension of the exclusionary rule and must therefore be reversed." *Fidler*, 72 Ill. App. 3d at 926.

See also *People v. Manna* (1981), 96 Ill. App. 3d 506, 516 (this court again held that evidence gathered by Federal authorities in violation of the Illinois eavesdropping statute was admissible when there was nothing in the record to suggest a collusive attempt to evade the Illinois statute).

In *People v. Winchell* (1986), 140 Ill. App. 3d 244, the eavesdrop-

ping was carried out by both Illinois and Federal authorities in compliance with Federal law but in violation of the Illinois directives. The court held the evidence to be admissible as there was no evidence of collusion to avoid the Illinois requirements. *Winchell*, 140 Ill. App. 3d at 246, 247.

■■ The only difference in this case from those cited above is that, in admitting the tapes, the trial court relied on the fact that foreign State authorities conducted the eavesdropping pursuant to their State statutes as opposed to Federal authorities acting pursuant to Federal directives. We find this distinction to be meaningless. The policy behind the exclusionary rule, as enunciated by this court in *Fidler*, is not forwarded by suppression of evidence obtained by others in conformance with laws governing their conduct, regardless of whether it is the Federal government or a foreign State agency. We find that the absence of evidence of collusion between Oklahoma authorities and Illinois authorities to circumvent the Illinois eavesdropping statute renders the evidence admissible. The trial court was correct in allowing the taped conversations into evidence.

Accardo next contends that he was denied his constitutional right to confrontation due to the State's failure to comply with discovery requests. Specifically, Accardo claims that he should have received the notes taken by Lowrey during the interview with Maret. Accardo also claims that he should have received the written statement given to Lowrey by Maret. Due to these omissions, Accardo argues that his right to cross-examination was nullified.

■■ It is uncontradicted that Lowrey's notes of his interview with Maret were destroyed. Lowrey testified that as the investigation progressed, his notes would be typed by his secretary and the notes destroyed. It is obvious that evidence cannot be discovered if it does not exist. The fact that the notes were destroyed may reflect on Lowrey's credibility. However, Lowrey was present at trial and subject to cross-examination. He was questioned about the notes and his methods of investigation. The fact that the notes were destroyed is not a denial of Maret's right to confrontation.

■■ Additionally, there is some question as to whether Maret prepared a written statement. Maret testified that he did, but Lowrey testified that if it was not included in the file that he produced, it did not exist. Again, nonexistent evidence cannot be disclosed. Absent proof that the statement exists, there can be no error in failing to tender it to Accardo.

Accardo also claims that his right to confrontation was violated as the State did not fully disclose Maret's criminal conduct and the ex-

tent of promises of leniency given to Maret. Accardo cites *Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763, in support of his argument. In *Giglio*, the assistant United States Attorney who presented the case to the grand jury promised the witness, a coconspirator, that he would not be prosecuted if he testified before the grand jury and at trial. The assistant United States Attorney who tried the case was unaware of the promise of leniency. The defendant filed a motion for a new trial on the basis of newly discovered evidence, contending the government failed to disclose the alleged promise of leniency made to its key witness in return for his testimony. The court held that the defendant was entitled to a new trial because the witness' credibility was an important issue in the case and an agreement as to future prosecution would be relevant to his credibility. *Giglio*, 405 U.S. at 154, 31 L. Ed. 2d at 108, 92 S. Ct. at 766.

The case at bar is distinguishable in two respects. First, in this case, the trier of fact was clearly apprised that an agreement existed in which Maret would be given leniency in exchange for his testimony. Lowrey and Maret both testified that he was to receive a "total pass" on his probation violation *if* he agreed to cooperate. This fact is emphasized by the evidence that Maret refused to cooperate in the past when he was denied leniency. Unlike *Giglio*, Accardo was able to attack Maret's credibility by cross-examining him regarding this agreement. It was certainly established that Maret was cooperating in exchange for leniency. The lack of detail concerning the agreement and the circumstances surrounding it is a result of Accardo's failure to investigate.

Secondly, Accardo was aware of an agreement to cooperate prior to trial. When made aware at trial that it was Devlin who had "arrested" Maret and offered the "total pass," Accardo did not request a continuance to interview Devlin. In fact, Accardo did not request any relief. This is contrary to *Giglio*, in which the defendant requested relief from the trial court as soon as he discovered the omitted evidence. It is true that Devlin was not disclosed to Accardo prior to trial. However, while the purposes of discovery are to eliminate surprise and unfairness, and to afford a party an opportunity to investigate, upon learning of a failure to disclose information, the defendant must take affirmative action. (*People v. Smith* (1982), 111 Ill. App. 3d 895, 905.) The failure to request a continuance in order to investigate or interview witnesses negates a claim of surprise or unfairness. (*Smith*, 111 Ill. App. 3d at 905.) Accardo was aware that some type of agreement was made with Maret prior to trial. Accardo

did not seek a continuance to interview Devlin and find out the specifics of the agreement. Therefore, Accardo cannot now claim prejudice. The alleged discovery violations did not amount to a deprivation of Accardo's right to confrontation.

Defendant next contends that his sixth amendment right to confrontation was also violated when the court restricted his cross-examination of Maret. Specifically, Accardo alleges that the court erred when it allowed Maret to invoke his fifth amendment right against self-incrimination and decline to answer several questions.

On cross-examination, Accardo asked Maret, *inter alia,* the following three questions:

"Q. So you deny you were using cocaine in 1988?

\* \* \*

Q. You agreed to certain conditions as part of probation. You signed a document that says I agree.

\* \* \*

And you violated the conditions, is that correct, as you have told us?

\* \* \*

Q. Well, Mr. Maret, let's quit skirting the issue. Did you give him names of people you purchased drugs from?"

In response to each of these questions, Maret declined to answer, citing his fifth amendment rights. Accardo argues that Maret had waived his rights against self-incrimination and, if he had not, Maret's prior testimony should have been stricken.

■ It is clear that a defendant has the right to confront and cross-examine witnesses against him. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8.) While the scope of cross-examination is within the trial court's discretion, that discretion must be exercised in a manner allowing the defendant wide latitude in establishing interest, bias, or motive of a witness. (*People v. Adams* (1984), 129 Ill. App. 3d 202, 207-08.) Where the credibility of the witness is a key issue, wide latitude in conducting cross-examination is particularly important. *Adams,* 129 Ill. App. 3d at 208.

■ It is also clear that a witness has the right to remain silent, and he cannot be compelled to provide answers which may tend to establish his criminal liability. (U.S. Const., amend. V; Ill. Const. 1970, art. I, §10.) A witness may, however, waive this privilege against self-incrimination if he answers a question without claiming the privilege. *People v. Nachowicz* (1930), 340 Ill. 480, 492.

In *Rogers v. United States* (1951), 340 U.S. 367, 95 L. Ed. 344, 71 S. Ct. 438, the United States initiated contempt proceedings against

Rogers based on her refusal to answer questions propounded by a grand jury and by the court. Rogers did testify that she had been the treasurer of the Communist Party until a specific date, at which time she turned the books and records of the party over to another individual. Rogers refused to identify that individual, citing her privilege against self-incrimination. The court held her refusal to answer further inquiry improper, citing the uniform position that where incriminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details. (*Rogers*, 340 U.S. at 371-72, 95 L. Ed. at 348, 71 S. Ct. at 441.) The court reasoned that to uphold a claim of privilege in this situation would open the door to distortion of the facts by allowing a witness to select any stopping point in the testimony. *Rogers*, 340 U.S. at 371, 95 L. Ed. at 348, 71 S. Ct. at 441.

In discussing the same issue, our supreme court found that when a witness voluntarily answers questions propounded on direct examination, he waives his privilege against self-incrimination and subjects himself to the right of the other party to a full cross-examination of him and a disclosure of the whole truth as to the matters about which he testified. (*Nachowicz*, 340 Ill. at 492-93.) The court stated:

> "The reason of this rule is that a witness cannot arbitrarily waive his privilege in part for the purpose of revealing only so much of the truth as will benefit one of the parties and assert it in part when interrogated as to facts which might benefit the other party. When the privilege is once waived in a trial it is completely waived for that trial and the witness becomes subject to cross-examination the same as any other witness examined in the case. *** If the witness consents to testify to one matter tending to criminate himself he must testify in all respects relating to that matter so far as material to the issues. If he waives the privilege he does so fully in relation to that act ***." (*Nachowicz*, 340 Ill. at 493.)

This court has also espoused a view consistent with this approach. See *Heath v. Heath* (1986), 143 Ill. App. 3d 390, 397.

In *People v. Peebles* (1983), 120 Ill. App. 3d 376, the defendant was charged with theft and conspiracy to commit theft. The defendant's husband, after waiving his fifth amendment rights, testified for the defense. However, during cross-examination, he asserted his fifth amendment rights when asked questions relating to his direct testimony. The court noted that a witness may not claim the privilege against self-incrimination on cross-examination to matters reasonably related to the subject matter discussed during direct examination. (*Peebles*, 120 Ill. App. 3d at 381.) The court, finding that the witness'

testimony was not subject to proper cross-examination due to the assertion of his fifth amendment right, held that the testimony was untested and clearly unreliable. (*Peebles*, 120 Ill. App. 3d at 382.) The court affirmed the trial court's decision to strike the witness' testimony. *Peebles*, 120 Ill. App. 3d at 382.

In the case at bar, it is clear that the questions propounded on cross-examination to which Maret asserted his fifth amendment rights directly related to matters raised on direct examination and which had already been discussed somewhat during Maret's cross-examination. Maret had testified to the circumstances surrounding his 1988 detention for possession of cocaine. He admitted he was, in fact, in possession of cocaine. He acknowledged the conditions of his probation. Additionally, he testified about the interview with Lowrey and the statement he prepared. Maret also admitted that he was a rather large drug dealer in the past and had purchased drugs from Accardo and O'Leary. By testifying to the above incidents and facts, Maret waived his right to refuse to answer the questions propounded on cross-examination. Maret was allowed to testify selectively to those things which benefitted the State and to refuse to provide the whole story. This resulted in a distortion of the facts. Maret's testimony was not fully tested. The court erred by permitting Maret to decline to give the details of these acts to which he had already testified and then not striking his testimony.

Additionally, we note that Accardo was attempting to establish that Maret was a narcotics addict. Narcotics addiction is a proper area of cross-examination as the testimony of a narcotics addict is subject to suspicion because habitual users of narcotics become habitual liars. (*People v. Strother* (1972), 53 Ill. 2d 95, 99; see also *People v. Collins* (1985), 106 Ill. 2d 237, 270.) Accardo was entitled to have Maret respond to questions concerning his recent drug use and possible addiction.

Accardo also contends that the court erred by not allowing him to impeach Maret with statements made by Maret's attorney during Maret's sentencing hearing in 1986. Maret's attorney, in arguing for a suspended sentence, told the court that Maret would not be working as a plumber if he was a large drug dealer as the prosecution alleged. Accardo sought to use this statement to impeach Maret as it directly contradicted Maret's testimony in the case at bar. Accardo argued that Maret would say anything that would benefit him regardless of the truth. The court sustained the State's objection to this inquiry and did not permit Accardo to question Maret further on this issue. Accardo argued that the statements made by Maret's attorney at his

sentencing hearing are attributable to Maret and can be used to impeach Maret in the case at bar.

■■■ The statements made by Maret's attorney are arguably proper for impeachment purposes as they are prior inconsistent statements. Prior inconsistent statements are admissible for the purpose of impeachment. (See Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1.) A statement can be used as a prior inconsistent statement for impeachment purposes when the statement is specifically attributable to the witness. (*People v. Mays* (1980), 81 Ill. App. 3d 1090, 1097.) Although in a civil setting, this court has found that an attorney is the client's agent and statements made by the attorney are binding on the client. See *Lowe v. Kang* (1988), 167 Ill. App. 3d 772, 776.

■■■ Maret's attorney made statements to the court during a sentencing hearing in a previous proceeding that are directly contrary to the statements made by Maret in the case at bar. In the previous proceeding, Maret's attorney stated that Maret was a plumber and *not* a large drug dealer during the early 1980s. Maret did not exercise his right to allocution and remained silent in the face of these statements. In this proceeding, Maret has stated that he *was* a large drug dealer during the early 1980s. The statements made by Maret's attorney on his behalf during his sentencing hearing should be attributed to Maret and allowed for impeachment purposes. This is particularly true as Maret was present during the hearing and did nothing to indicate that these statements were false.

The court in the instant case was incorrect in finding that this line of questioning was an attempt to retry Maret on the previous charges. This line of questioning was an attempt to establish that Maret's story changes depending on the circumstances with which he is confronted. It is irrelevant for purposes of impeachment which story is true. When determining the witness' credibility, the court is not concerned with whether Maret is in fact a plumber or a drug dealer. The important aspect of this inquiry is that Maret's story changes, and that relates directly to his credibility. The court erred by not allowing Accardo to impeach Maret with the statements made by his attorney during his earlier sentencing hearing.

■■■ Accordingly, we find that Accardo's right to cross-examine witnesses against him was improperly restricted. The court erred by allowing Maret to invoke his fifth amendment rights and decline to answer several questions propounded on cross-examination after Maret had waived his fifth amendment rights. If Maret stood on his fifth amendment rights, the court should have struck his testimony. Additionally, the court erred by not allowing Maret to be impeached

with statements made at his prior sentencing hearing. Due to these errors, a new trial is warranted.

Since we have found that relevant and important impeaching evidence was improperly excluded, it is not necessary or even possible for this Court to determine if Accardo's affirmative defense of entrapment was refuted beyond a reasonable doubt. For example, Maret may have refused to answer in which case the Court should have stricken the testimony and the record would then reflect little, if any, evidence to refute Accardo's defense of entrapment.

Reversed and remanded.

UNVERZAGT, P.J., and DUNN, J., concur.