FIFTH DIVISION

September 30, 1999

No. 1-97-1173

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

v. )

)

MIGUEL FIGUEROA, ) The Honorable

) Michael B. Bolan,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

A jury found defendant Miguel Figueroa guilty of first degree murder and the trial court sentenced him to 80 years in prison.  Defendant appeals, arguing that his conviction should be reversed because he was denied his right to present a defense when the trial court struck his testimony and denied his request after the parties had rested to allow his testimony.  Defendant also claims the trial court made improper comments, the court allowed improper gang references, he was denied his right to exercise a peremptory challenge, the court failed to instruct the jury on his claim of self-defense, the court allowed improper hearsay testimony, the sentencing hearing was unfair, the sentence imposed was excessive, and the trial court erred in denying his motion to amend the record.

For the reasons that follow, we reverse and remand.

Defendant Miguel Figueroa and codefendant Eduardo Estremera were indicted for first degree murder and armed robbery for the alleged shooting death and robbery of Dmitry Rabin.
(footnote: 1)  They were simultaneously tried before separate juries.
(footnote: 2)  We briefly summarize the essential testimony in defendant's case.

At trial, the State's key witness, Xavier Burbano, testified that he and Rabin arranged to meet Alex Ojea to purchase 10 pounds of marijuana for $10,500.  On August 5, 1993, Rabin and Burbano drove to a car wash in Rabin's car.  Ojea arrived in an Oldsmobile and two other men arrived in a van.  When Burbano approached the van, the passenger pulled out a long revolver and told him to "[b]ack off."  Burbano identified Estremera as the man with the gun.  After Ojea spoke with the men in the van, the two men drove around the block, with Burbano, Rabin, and Ojea following.  When they stopped, Estremera exited the van with the gun.  Burbano told Estremera to put the gun away, and Estremera put it on the passenger's seat of the van.  Burbano asked to see the marijuana, and Estremera insisted that he enter the van to look but Burbano was afraid.  Estremera picked up the gun and indicated that he thought they were the police.  The two men in the van then drove away.  Burbano identified defendant as the van driver.

Burbano later received a phone call from Ojea, informing him that they wanted to try the exchange again.  This time Burbano and Rabin brought a loaded sawed-off shotgun.  The two men drove a small grey car rather than the van, and Rabin and Burbano followed them.  When they stopped, Estremera checked Burbano for weapons and they agreed to exchange cars.  Burbano would ride with defendant and Estremera would ride with Rabin.  They drove around the block with Rabin and Estremera in the lead, defendant and Burbano following, and Ojea following last.  At one point, Rabin exited his car to put the shotgun in the trunk.  The procession eventually stopped and they all exited their cars.

Burbano approached Rabin and he started "back-peddling" and "his eyes got real wide."  Burbano asked what the problem was and Rabin responded, "He has got a gun."  Defendant was walking behind Burbano with a gun.  Estremera started to walk around behind Rabin.  One of the men said that they had better marijuana and Ojea displayed a bit of it.  Rabin and Burbano told them that they wanted something better.  Burbano told the men that he and Rabin did not have enough money.  Defendant asked who had the money and Rabin acknowledged that he had it.  Burbano stated that Estremera and defendant then "exchanged a look" and defendant raised the gun and shot at Rabin.  As Burbano ran away, he heard several more shots.  He looked back and saw Estremera standing behind Rabin shooting him in the back.  Rabin was on his hands and knees in the street.  Burbano saw Estremera shoot at Rabin twice.

On cross-examination, Burbano stated that when Ojea showed them the small piece of marijuana, Rabin said that it was not quality marijuana and Estremera indicated that he could get better.  The situation was intense and they all were agitated.

 Defendant testified in his own defense, admitting that he had one felony conviction and that he sold drugs for income in 1993.  On August 5, 1993, he agreed to obtain 10 pounds of marijuana for Estremera.  Defendant, Estremera, and Ojea, who was with Estremera, then drove to Diversey and Cicero, where defendant left the others to obtain the marijuana.  When he returned, defendant and Estremera drove in defendant's van and Ojea drove his car to a car wash where Burbano was waiting.  Estremera spoke with Ojea.  Burbano walked toward the van and Estremera told him to stay away.  Defendant indicated to Estremera that Burbano looked like a police officer.  Estremera reentered the van and they drove away.  Burbano entered Ojea's car and they followed the van.  Defendant stopped the van.  Estremera got out, pointed a .44-caliber handgun at Burbano and Ojea, and told them to quit following the van.

Later that day, they resumed the deal.  This time defendant drove his wife's car.  When defendant and Estremera arrived at the meeting place, Ojea told defendant to follow Rabin, which he did until Rabin pulled over.  Estremera and Burbano exited their cars and, after a conversation, Estremera told defendant that he was going to ride with Rabin and Burbano would ride with defendant.  When they arrived at Belden and Long, Rabin stopped and they all exited their cars.  Defendant held his .44-caliber gun in his hand next to his leg and pointing toward the ground.  He stated that the gun was for his protection.  When Burbano told him the gun was not necessary, he put it in his waistband.  Ojea said that he had seen a police car and left to investigate.  Burbano told Rabin to hide something, and Rabin retrieved a shotgun from the front seat of his car which he placed in his trunk.  Rabin and Estremera were talking very loud.  As Ojea returned, they were getting louder and defendant was very nervous and scared.  As the conversation got louder, defendant saw Rabin reach "like he was going for a gun."  Defendant was scared and shot over the top of Rabin's car in the direction of Rabin.

Defendant heard more gunshots as he ran to his car.  As he and Estremera attempted to flee the scene, he had to drive around the body in the street.  Defendant heard a loud shot come out of his car and saw his .44-caliber gun in Estremera's hand.  After they drove away, Estremera gave him his .44-caliber gun and a .25-caliber automatic.  Defendant drove to a friend's house and called another friend to take the guns and the drugs.  Defendant stated that he shot Rabin because he feared for his life.  He did not plan to commit a murder or an armed robbery with Estremera.  His sole intent was to sell marijuana.

On cross-examination, defendant stated that from January 1993 until August 1993 he made around $25,000 to $35,000 selling drugs.  The testimony continued as follows:

"[By Assistant State's Attorney Adams:]  Who did you buy the drugs from?

MS. LAMBERT [Defense Counsel]:  Objection.

THE COURT:  Overruled.

A. I can't answer that.

THE COURT:  You have to answer it or we'll strike your testimony.

MS. LAMBERT: I beg your pardon.

THE COURT:  He has to answer the question.  He has no right to refuse to answer or I will strike his testimony.  You talked to your client.

MS. LAMBERT:  He has to disclose the name?

THE COURT:  Absolutely.  Positively.

***

MS. LAMBERT:  Judge, I would ask to be heard in a sidebar.

THE COURT:  Do you have an objection?

MS. LAMBERT:  Yes.

THE COURT:  The objection is overruled.  It is a drug dealer privilege or what are you talking about?  There is no privilege.  You're on the witness stand.  You're testifying.

MS. LAMBERT:  That is not the reason I am objecting."

The trial court then conducted a hearing out of the presence of the jury during which defense counsel indicated that defendant was afraid to give the name of the person who sold him the drugs.  The trial court rejected his excuse, noting that counsel asked defendant about obtaining the drugs during direct examination.  The court overruled the objection.  

The proceedings resumed in the presence of the jury:

"BY MR. ADAMS: 

Q. You can answer the question now, Mr. Figueroa. 

A. I will not answer that question.

MR. DOSCH [Defense Counsel]:  Would it be possible to confer with our client to advise him of your Honor's ruling?

THE COURT:  No. I will tell him the ruling.  Either you answer the question or all your testimony is stricken.  There is no right.  You have waived any right against self-incrimination by testifying and by talking about who you buy your drugs from.  That is not protected under the law.  You cannot give partial testimony, sir.

If you want to do that, then I am going to have to strike all your testimony from the record.

Ask the question.

BY MR. ADAMS:

Q.  Mr. Figueroa, who did you buy your drugs from January of 1993 to August of 1993?

A. I will not answer that question.

THE COURT:  Proceed to ask another question if you choose.

BY MR. ADAMS:

Q. Mr. Figueroa, who did you give the guns to, the .44 caliber and the .25 caliber guns to after you shot and killed Dimitri Rabin?

A. The same person I bought my drugs from.

Q. And who is that person?

A. I will not disclose his name.

MR. ADAMS:  Your Honor, I would ask the Court to instruct the witness to answer the question.

THE COURT:  You're instructed to answer the question.

A. I won't answer it, your Honor.

THE COURT:  You're all through then.  The jury is instructed to disregard this man's testimony and its consideration.  It is as if it were never said.  Have a seat."

Defense counsel asked to confer with defendant but the court denied the request and instructed counsel to call the next witness or rest.  The defense then presented two stipulations and asked for an opportunity to confer with defendant before resting.  After further discussion outside the presence of the jury, the trial court denied the request.  Defendant submitted some photographs into evidence and rested his case.  The State rested without offering rebuttal evidence.  The court instructed the jurors that the proofs were closed and they would hear closing argument the next day.

The next day, defense counsel stated that defendant was willing to answer the State's questions and requested that he be allowed testify.  This request came before the instruction conference, before closing argument, and before jury deliberations.  The State objected and claimed prejudice, asserting that the jury had already improperly heard defendant's claim of self-defense.  The State did not argue that it would no longer have rebuttal witnesses available.  After hearing argument on the matter, the trial court denied the request to reopen the evidence.  The jury found defendant guilty of first degree murder and not guilty of armed robbery.  The trial court denied defendant's motion for a new trial and sentenced him to 80 years in prison.

On appeal, defendant argues that the trial court abused its discretion in striking his testimony so as to deprive him of an opportunity to defend himself.  A defendant who takes the stand and testifies in his own behalf in a criminal case not only offers himself as a witness on his own behalf but thereby subjects himself to legitimate cross-examination.  
People v. Burris
, 49 Ill. 2d 98, 104 (1971), quoted in 
People v. Dawson
, 57 Ill. App. 3d 712, 715 (1978).  Although cross-examination is generally limited to matters inquired into on direct examination, it may develop all circumstances within the knowledge of the witness that explain, qualify, discredit, or destroy his direct testimony.  
People v. Williams
, 66 Ill. 2d 478, 486-87 (1977).  The extent of the cross-examination rests in the sound discretion of the trial court.  
Burris
, 49 Ill. 2d at 104.

There is no question that defendant waived his right against self-incrimination.  Because defendant testified on direct examination about obtaining the drugs just prior to the meeting and because it was the State's contention that defendant and Estremera never possessed any drugs but intended to rob Rabin and Burbano, the question as to the source was relevant and important in the case.

Nevertheless, defendant contends that the trial court erred in striking all of his testimony because it deprived him of his defense.  He cites two cases reversing lower court decisions where the defendants were barred from presenting evidence as sanctions for discovery violations.  See 
People v. Foster
, 271 Ill. App. 3d 562 (1995); 
People v. Brooks
, 277 Ill. App. 3d 392 (1996).  Defendant also cites 
People v. Quick
, 236 Ill. App. 3d 446 (1992), in which this court found reversible error where the trial court barred part of a defendant's testimony.  This court ruled that because the excluded testimony was improperly excluded as hearsay and it was crucial to the defendant's defense, she was entitled to a new trial.  
Quick
, 236 Ill. App. 3d at 453.  Neither party presents a case with the same factual situation presented here.

Independent research reveals relevant Illinois cases involving the striking of a witness' testimony.  In 
People v. Peebles
, 120 Ill. App. 3d 376 (1983), the defendant claimed that she was denied a fair trial because the testimony of one of her witnesses was completely stricken from the record when the witness asserted his right against self-incrimination on cross-

examination.  This court affirmed because the witness' testimony on direct was not subject to proper cross-examination and, as presented, the testimony "was untested and clearly unreliable."  
Peebles
, 120 Ill. App. 3d at 382.

In 
People v. Accardo
, 195 Ill. App. 3d 180 (1990), the court ruled that a defendant's right to cross-examination was violated when a State witness was allowed to invoke his fifth amendment rights during cross-examination.  After citing 
Peebles
, the court determined that, by allowing the witness to testify selectively to those things that benefitted the State and to refuse to provide the whole story, a distortion of the facts resulted.  Thus, the trial court erred in permitting the witness to decline to answer and in refusing to strike his testimony.  
Accardo
, 195 Ill. App. 3d at 193-94.

In 
People v. Peterson
, 34 Ill. App. 2d 352
 (1962), the defendants argued that they were deprived of a fair trial where the trial court refused to strike the testimony of an accomplice witness who refused to answer many questions on cross-

examination.  In affirming, this court determined that the defendants had a full and complete cross-examination.  Most of the questions on cross-examination dealt with the witness' involvement in other criminal activities and the trial judge allowed a very broad scope in testing the credibility of the witness and in attempting to impeach him.  The record also revealed that the witness responded with extensive factual answers, except for the specific refusals to incriminate himself.  
Peterson
, 34 Ill. App. 2d at 358.  Our supreme court affirmed, stating that even if it assumed that the witness' claim of privilege was improperly sustained on some questions, "it does not appear that the defendants were prejudiced in view of the wide latitude afforded them in impeaching the witness."  
People v. Peterson
, 26 Ill. 2d 608, 609 (1963).

Independent research also reveals several factually similar cases from federal jurisdictions.  In 
Williams v. Borg
, 139 F.3d 737 (9th Cir. 1998), the ninth circuit held that striking a defendant's testimony in its entirety because he refused to submit to cross-examination regarding his prior convictions did not deprive him of his right to testify.  In 
United States v. Bartelho
, 129 F.3d 663 (1st Cir. 1997), the first circuit held that the district court did not err when it struck a defendant's direct testimony because he refused to answer the government's cross-examination question about his drug supplier.  See also 
United States v. Montgomery
, 998 F.2d 1468 (9th Cir. 1993) (no abuse of discretion in striking defendant's testimony when he refused to answer questions concerning the identity of his drug source); 
United States v. Panza
, 612 F.2d 432 (9th Cir. 1979) (no abuse of discretion in striking defendant's testimony in light of his refusal to answer questions on cross-examination); 
Lawson v. Murray
, 837 F.2d 653 (4th Cir. 1988) (trial court could strike all of defense witness' testimony when witness curtailed cross-

examination by invoking the fifth amendment privilege); 
United States v. McKneely
, 69 F.3d 1067 (10th Cir. 1995) (no error in striking defense witness' testimony where witness' refusal to answer questions on the identity of his drug source effectively prevented the prosecution from cross-examining him).

However, in 
United States v. Kikumura
, 698 F. Supp. 546 (D.N.J. 1988), the court held that a defendant's selective invocation of his fifth amendment privilege against self-

incrimination during a suppression hearing did not warrant striking the defendant's testimony, because the questions that the defendant refused to answer were not directly relevant and the refusal to answer did not unduly prejudice the government.  See also 
United States v. Negrete-Gonzales
, 966 F.2d 1277 (9th Cir. 1992) (district court erred in striking all of key defense witness' testimony merely because she refused to identify the source of the cocaine where witness at least indicated that defendants were not the source); 
State of Wisconsin 
el rel. 
Monsoor
 
v. Gagnon
, 497 F.2d 1126 (7th Cir. 1974) (defense witness' invocation of the privilege against self-incrimination on collateral questions not the subject matter of his direct examination did not warrant striking all of the witness' testimony).

The record indicates that defense counsel informed defendant before he testified that he might be questioned about his drug source.  Counsel stated in chambers, "He said that he was afraid.  And I said, you are going to be asked that question and I will object and I will tell the judge your reason for not wanting to answer it, but you may be forced to disclose it."  The trial court also warned defendant several times that his testimony would be stricken.  Despite these warnings, defendant refused to answer.  Under the circumstances, we cannot say that the trial court abused its discretion when it struck defendant's testimony.  A defendant does not have the right to choose what questions he will answer once he takes the stand.  The evidence here was relevant and within the bounds of permissible cross-examination.  The trial court's decision to strike the testimony was appropriate.

After the parties had rested, however, defendant asked if he could then testify.  It is within the sound discretion of the trial court to decide whether a case may be reopened for further evidence and this discretion will not be interfered with except where it is clearly abused.  
People v. Cross
, 40 Ill. 2d 85, 90 (1968) (finding no prejudicial error in reopening case for the State to present additional evidence), quoted in 
People v. Watkins
, 238 Ill. App. 3d 253, 258 (1992).

In 
People v. Johnson
, 151 Ill. App. 3d 1049, 1053 (1987), defense counsel informed the trial court that the defendant was "incapable of testifying in her defense and therefore would rest her case."  The next day, counsel asked to reopen the defense so that the defendant could testify because she was now more "composed" and willing to testify.  The trial court denied the motion.  
Johnson
, 151 Ill. App. 3d at 1053.  This court stated:

"[A] trial court should not exclude defense testimony except in the most extreme circumstances.  [
People v. Franceschini
, 20 Ill. 2d 126 (1960).]  It is a fundamental constitutional right for a defendant to testify in his own defense.  [
People v. Knox
, 58 Ill. App. 3d 761 (1978); 
Alicea v. Gagnon
, 675 F.2d 913 (7th Cir. 1982); Ill. Const. 1970, art. I, § 8.]  Society's interest in the efficient administration of justice has to be balanced with a defendant's constitutional right to a fair opportunity to defend.  [
People v. Lott
, 66 Ill. 2d 290 (1977).]"  
Johnson
, 151 Ill. App. 3d at 1053-

54.

The 
Johnson
 
court noted that the State's opportunity to rebut the defendant's testimony had not changed and the testimony would not have disrupted the orderly flow of the trial in any significant way.  The court also observed the possibility that the decision not to testify stemmed from the defendant's emotional state as opposed to an intentional manipulation of the trial process.  Thus, the court found it reversible error to refuse to reopen the case and allow the defendant to exercise her right to testify.  
Johnson
, 151 Ill. App. 3d at 1054.

In 
People v. Goff
, 299 Ill. App. 3d 944, 948 (1998), the trial court refused to allow the defendants to reopen their case to offer a new witness.  This 
court determined that the newly proffered testimony was material and would have impeached a primary State witness.  
Goff
, 299 Ill. App. 3d at 948-49.  Further, opening the case would not have added a day to the trial because the witness appeared ready to testify before closing arguments commenced.  Although the trial court believed the witnesses would unfairly "surprise" prosecutors, this court noted that the prosecutors admitted that the presentation of the witness would not violate discovery orders and the record showed that the State knew of the efforts to produce the witness and the nature of his testimony at least a day before closing argument.  The State made no mention of surprise and conceded it could have produced any necessary rebuttal witnesses.  
Goff
, 299 Ill. App. 3d at 949.  This court ruled that because the case presented no extreme circumstances justifying exclusion of the exculpatory testimony, the trial court abused its discretion by denying the motion to reopen.  
Goff
, 299 Ill. App. 3d at 949.

In 
Watkins
, 238 Ill. App. 3d at 258, the defendant failed to call a police officer to perfect the impeachment of another witness.  After the close of the evidence, the State moved to strike the cross-examination of the witness based upon the failure to perfect the impeachment.  The defendant moved to reopen the proofs but the trial court denied the motion and struck the cross-examination.  This court stated:

"'In considering a motion to reopen proofs, a trial court should take into account various factors, including the existence of an excuse for the failure to introduce the evidence at trial, 
e.g.
, whether it was inadvertence or calculated risk; whether the adverse party will be surprised or unfairly prejudiced by the new evidence; whether the evidence is of utmost importance to the movant's case; and whether there are the most cogent reasons to deny the request.'"  
Watkins
, 238 Ill. App. 3d at 258, quoting 
Hollembaeck v. Dominick's Finer Foods, Inc.
, 137 Ill. App. 3d 773, 778 (1985).

In affirming, this court noted that defense counsel did not present an excuse for failing to recall the officer and the witness' testimony was not "of the utmost importance" to the defendant's case.  
Watkins
, 238 Ill. App. 3d 258.

The 
Watkins
 factors are similar to the factors presented in federal case law, which provides that when a defendant moves to reopen his case to testify on his own behalf, the following factors should be considered: (1) the timeliness of the motion; (2) the character and importance of the testimony; (3) the effect of granting the motion, particularly any prejudice to the State's case; and (4) the reasonableness of the explanation for failing to present the evidence in the case in chief.  
United States v. Walker
, 772 F.2d 1172, 1177-85 (5th Cir. 1985) (holding that district court abused discretion in denying defendant's motion to reopen his case to allow defendant to testify), quoting 
United States v. Thetford
, 676 F.2d 170, 182 (5th Cir. 1982), quoting 
United States v. Larson
, 596 F.2d 759, 778 (8th Cir. 1979);
 
see also 
Bloomquist v. State
, 832 P.2d 177 (Alaska App. 1992) (citing 
Walker
 and remanding to allow defendant, who waived his right to testify and later sought to reopen his case, to make an offer of proof as to his testimony); but see 
Register v. State
, 718 So. 2d 350 (Fla. App. 1998) (affirming denial of defendant's request to reopen proofs so he could testify, where State had offered rebuttal evidence and defendant failed to proffer the substance of his intended testimony).

Defendant's failure to offer the evidence during his case was not exactly inadvertent.  Defense counsel warned him that he would probably be asked the question about the source of his drugs and he would probably be required to answer.  Despite the repeated warnings of counsel and the trial court, defendant chose not to answer.  These circumstances suggest that defendant took his chances that he could face the very situation that occurred.

On the other hand, defendant's request to reopen his case came before the instruction conference, before closing arguments, before any jury deliberations, and at a time when no further evidence had been offered by the State.  This was not untimely and there was no evidence that the State would have been prejudiced by the presentation of the testimony at that time.  The State was already prepared to cross-examine defendant and made no argument that it would no longer have rebuttal witnesses available.  The State merely asserted that it was prejudiced because, although the testimony was theoretically stricken, the jury had the opportunity to hear defendant's claim of self-

defense.  We agree that this could be significant in some cases, but the jury in this case did not receive the self-defense instruction.  Moreover, if the defendant testified, this problem would no longer exist.

Unquestionably, defendant's testimony was of the utmost importance to his case.  This was not like the situation in 
Watkins
 where it related to a secondary issue.  The evidence of guilt was strong.  Defendant's self-defense claim was important as his only defense to the State's case, regardless of the fact that the stricken testimony was not particularly strong evidence of self-defense.

In denying the motion to reopen, the trial court carefully considered and weighed defendant's right to present his case.  The court also expressed concerned about defendant's attempt to manipulate the trial, reasoning that a defendant does not have the right to have two trials "and say, well, upon reconsideration, I'll present this defense as opposed to that defense."

Upon review of the record, we hold that the trial court should have granted the request to open the proofs to allow defendant to testify.  We agree with the trial judge that a defendant should not be allowed to manipulate the trial process and there certainly may be situations in which a defendant should not be allowed to reopen the proofs when his testimony has been stricken for failing to submit to cross-examination.  In the instant case, however, we can see no prejudice to the State if the request had been granted.  When balancing the State's and society's interests against defendant's right to testify and present a defense, we conclude that the court should have allowed defendant to reopen his case.  We therefore hold that defendant is entitled to a new trial.

We further hold that the record contains sufficient evidence for the jury to have found the elements of the offenses beyond a reasonable doubt.  Thus, although we make no finding as to defendant's guilt that would be binding on retrial, defendant faces no risk of double jeopardy on remand.  See 
People v. Fornear
, 176 Ill. 2d 523, 535 (1997).

While defendant raises numerous other issues, only two are likely to reappear on remand.  Defendant argues that the trial court erred in allowing gang testimony.  Specifically, he complains that the trial court allowed one of the police detectives to testify that he was looking for "King Richie" in connection with this case, which is apparently defendant's nickname.  Gang-related evidence will not necessarily be excluded if it is relevant and admissible.  
People v. Davenport
, 301 Ill. App. 3d 143, 150 (1998).  We fail to see how this testimony created "highly prejudicial" gang membership evidence.  The detective did not indicate that the nickname had a gang affiliation.  Thus, the testimony was not erroneously admitted gang evidence.

Defendant also contends that the trial court erroneously imposed an extended-term sentence of 80 years.  Section 5-8-

2(a)(1) of the Unified Code of Corrections (Code) (730 ILCS 5/5-

8-2(a)(1) (West 1992)) permits an extended-term sentence for first degree murder of 60 to 100 years.  One factor to consider in imposing an extended sentence is if the defendant is convicted of first degree murder after having been previously convicted of any offense listed under paragraph (c)(2) of section 5-5-3 of the Code within 10 years.  730 ILCS 5/5-5-3.2(b)(7) (West 1992).  The record indicates that defendant has a prior conviction for attempted first degree murder, which is one of the offenses listed under section 5-5-3(c)(2).  Thus, the trial court was authorized to sentence him to an extended term.

For the reasons stated, we reverse and remand for a new trial.

Reversed and remanded.

THEIS, P.J. and HARTMAN, J., concur.

FOOTNOTES
1:  An additional charge of unlawful use of a firearm was severed prior to trial.

2:  A jury found Estremera guilty of murder and armed robbery and this court affirmed the convictions in an order issued under Supreme Court Rule 23 (166 Ill. 2d R. 23), 
People v. Estremera
, No. 1-97-2359 (October 16, 1998).