THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GUS HARRIS, Defendant-Appellant.

Second District    No. 80-639

Opinion filed March 12, 1982.

Mary Robinson and Joe Tiebloom, both of State Appellate Defender's Office, of Elgin, for appellant.

Dennis P. Ryan, State's Attorney, of Waukegan (Robert J. Biderman and Phyllis J. Perko, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Gus Harris, was charged in Lake County on April 29, 1980, with the offenses of armed robbery, armed violence and aggravated battery. (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2(a), 33A—2, 12—4(b)(1).) The offenses were charged as the result of an occurrence during the early

morning hours of April 13, 1980, in Waukegan. Although the facts are in dispute, the complainant, Bertoldo Figueroa, utilizing a court-appointed interpreter, testified essentially that he and his wife played Bingo on the evening of April 12. Afterward, he parted with his homeward-bound wife, and went to a bar, Shorty's Tap. He testified he was asked by a woman there, Sharlotte Stinnette, for a ride home at about 2 a.m., and he drove her to a bar near her apartment. That bar was closed, so he walked her to the area just outside her apartment, where he was allegedly struck in the face by a knife-wielding man, later identified as the defendant. By his account, he was then forced to a second floor apartment of the building where he was several times hit again, twice with the knife, which caused cuts on his hands. Upon demand, he handed the man his wallet and two rings; the man turned these items over to Stinnette. The amount of money contained in the wallet was inconsistently reported at different times by the complainant to be either $30 or $40, or $80. The complainant's wallet was returned to him and he was allowed to wash his hands in the kitchen sink. He then ran out of the apartment to his car parked nearby. In the haste of departure, the car became hung up on the sidewalk, unable to be moved, and the complainant fled down the street on foot where he was observed, stopped, and questioned by a police officer. Figueroa relocated the apartment, and Stinnette answered the door after police knocked several times and announced their presence. She was arrested after Figueroa, approaching the apartment door in the company of police, sighted her and lunged at her. In an adjoining room, Ken Anderson, the defendant's cousin and Stinnette's boy friend, was rousted out of bed by the police, but Figueroa shook his head, indicating Anderson was not the man who used the knife. Further search of the apartment ultimately led police through a slightly ajar back door to the basement where the defendant was found.

He had been discovered sitting against a wall in the reportedly 40-degree basement of the building clad only in pajama bottoms and within arm's reach of the basement entrance doorway where the complainant's two rings and $15 in cash were found.

Although Figueroa denied such knowledge, Stinnette was reputedly a prostitute. Apparently unknown to him, Figueroa's wife had not stayed at home, but had observed him leave Shorty's Tap in Stinnette's company. Declared by the court as a hostile witness, Figueroa's wife testified that he had related to her that he was jumped by two men in the parking lot of the Rock Tavern, which was the bar near Stinnette's apartment where Figueroa had parked. Stinnette did not testify at trial.

On the night in question, the defendant testified he had misplaced his keys to Stinnette's apartment, where he lived with her and Anderson, and was asleep on the stairs waiting for Stinnette to return home. According to

the defendant's testimony, Anderson had not answered his knocks on the door because he was asleep in the apartment. When Stinnette arrived at the apartment accompanied by Figueroa, the defendant trailed them inside, whereupon Figueroa slammed the door, hitting him in the face. There was testimony the defendant was recovering from serious injury to his face after being hit with a baseball bat by a person against whom he was going to be a State's witness. The defendant confronted Figueroa for an explanation of his conduct, and Figueroa, shouting something in Spanish "came at me [the defendant] and I hit him." Stinnette then allegedly handed the defendant a knife, and Figueroa cut his hands trying to grab the knife held by the defendant. Defendant's demand that Figueroa leave the apartment was responded to with a loud flurry of Spanish. When the defendant's demand was repeated, Figueroa relinquished his rings and wallet to Stinnette, who immediately returned the wallet and washed Figueroa's hands in the kitchen sink and then bound the cuts with cloth. Figueroa then ran out of the apartment. Following Figueroa's exit, Stinnette told the defendant to go downstairs, gave him $15, which she produced from under her blouse, and Figueroa's two rings. Defendant testified it was usual for him to go downstairs when Sharlotte was expecting "company," and that he had been asking her for some money all week.

The defendant's pretrial motion to quash arrest and suppress evidence was denied after a hearing. Two motions for mistrial were also denied. The jury found the defendant guilty of aggravated battery and reckless conduct, and not guilty of armed violence and armed robbery. The defendant's motion for a new trial was denied and the court sentenced him to 30 months' probation, the first 113 days to be served in the county jail and credit for that amount of time already served was applied to his sentence.

Three issues are now raised on appeal: (1) Whether the trial court erred in denying defendant's motion for mistrial upon learning from the translator that she had improperly paraphrased the testimony of the complainant-witness thereby denying the defendant his right of confrontation; (2) Whether the verdicts returned by the jury were legally inconsistent; and (3) Whether the trial court erred in refusing to suppress the physical evidence.

The defendant first contends his right to confrontation was denied by virtue of the translator's confessed paraphrasing of questions and answers during the complainant's testimony. The record does not clearly reflect, nor has it been made apparent to this court, how many or which specific questions and/or answers were paraphrased. The State counters that the complainant's testimony, as translated, was intelligible, and that the defendant at no time during Figueroa's testimony objected to the compe-

tency of the interpreter's performance. The translator employed here was a Spanish-speaking court reporter.

The use of an interpreter during trial is a matter within the discretion of the trial court. (*People v. Soldat* (1965), 32 Ill. 2d 478.) The resolution of any question in this regard is whether the testimony presented through the interpreter is understandable, comprehensible, and intelligible; and, if it was not, whether such lack of such intelligibility was brought about by an ineffective and incompetent interpreter. (*People v. Niebes* (1979), 69 Ill. App. 3d 381.) *Niebes* cited to *People v. Starling* (1974), 21 Ill. App. 3d 217 for that proposition. The defendant finds *Starling* factually similar, and supportive of his argument; the State contends *Starling* is inapposite.

In *Starling*, the court found the defendant had been denied his right of confrontation due to the ineffective and incompetent performance of the court-appointed interpreter. In that case, the court sustained numerous defense objections to conversations being held between the witness and the interpreter and duly admonished the interpreter each time. Additionally, the witness' testimony as translated was unintelligible at various points throughout that trial, and even the State complained at least once about the interpreter's performance. Thus, that court found the selection of the interpreter constituted an abuse of discretion since it resulted in deprivation of the defendant's basic right of confrontation.

The defendant argues that even though Figueroa's testimony was understandable and intelligible for the most part as translated by the interpreter, her self-admitted paraphrasing of some of the questions and answers resulted in presentation to the jury of her version of the occurrence rather than the complainant's. The central issue appears to us to be whether the purportedly clarifying paraphrasing indulged in by the interpreter prejudiced the defendant's right to confrontation of the witnesses against him.

After reviewing the record, it is our opinion that the defendant is estopped from raising this issue since he invited or, at least, acquiesced in the error of which he now complains. As pointed out by the State, the defendant did not object to the interpreter's performance at any time during Figueroa's testimony. There was no hint the defendant was dissatisfied with, or could not understand, the testimony being translated back. Contrary to the assertion in his brief that the error could not have been discovered prior to the interpreter's admission in chambers (whereupon he timely requested a mistrial), we believe it would have been obvious to even non-Spanish-speaking persons that the interpreter and Figueroa were engaged in "conversation back and forth" rather than question-answer dialogue. Counsel failed to object to the excess questions and answers between witness and interpreter, and failed to timely request an admonishment from the court on this obviously improper practice.

Additionally, in our view, the record reveals the interpreter was induced to paraphrase by defense counsel's own posturing of his cross-examination. A significant number of defense counsel's questions were posed in the third person so as to actually cast the interpreter in the role of questioner. For example, rather than addressing the witness, defense counsel would direct the interpreter thusly:

"Q. [Mr. Stone]: Ask Mr. Figueroa if he didn't say he was first jumped and held at knife point in the parking lot at the Rock Tavern?

A. [Interpreter]: No.

Q. He denies he ever said that?

A. No, the truth is as I am telling you, as I have said.

Q. And ask Mr. Figueroa if he didn't tell the third story that he was jumped by two men in the parking lot.

A. No.

Q. And doesn't he recall telling that story to Mr. Duffy?

❊ ❊ ❊

Q. [Mr. Stone]: Isn't it true Mr. Figueroa —

A. [Interpreter]: No, it is not true.

Q. Isn't it true —

A. No, that's not true.

Q. I am asking you another question. Isn't it true that he is now saying that a black man, one black man jumped out of the bushes in front of 511 Genesee?

❊ ❊ ❊

Q. [Mr. Stone]: Ask Mr. Figueroa if as he walked up the stairs he didn't see Mr. Harris sitting in the hallway next to the door to Miss Stinnette's apartment.

A. [Interpreter]: He is the one that came out to hit me.

Q. And did—he did not see him sitting on the staircase asleep?

A. There was no one sitting on the stairs.

Q. And he did not enter the apartment with Miss Stinnette and slam the door in Mr. Harris' face?

THE INTERPRETER: Wait, say it again.

Q. Did he enter the apartment with Miss Stinnette and slam the apartment door in Mr. Harris' face?

A. I didn't do any of that."

The interpreter would also occasionally lapse into third-person responses:

"Q. [Mr. Stone]: However, on the night of April 13th, didn't you tell the police that eighty dollars was taken?

THE INTERPRETER: He said yes, more or less forty or eighty, around there.

Q. Ask him if it was forty or eighty that was taken from him."

■■ Certainly the form of many of counsel's questions was improper and shows the interpreter was afforded a margin of discretion in phrasing the questions to the witness and in reporting back his responses. Defense counsel must certainly have been aware of the crucial interplay of precision and nuance in effective cross-examination. Necessarily, then, he must also have been aware that his questions would first lose something in the translation from English to Spanish and vice versa, and then lose something again by virtue of the discretion afforded the interpreter in formulating the exact questions to be asked. Under these circumstances, we conclude the defendant precipitated the error he now says requires reversal. It is axiomatic that an accused cannot complain of error acquiesced in or invited by him. (*People v. Riley* (1964), 31 Ill. 2d 490.) Consequently, the trial court's denial of the defendant's motion for mistrial on this basis was not error.

Defendant next urges reversal on the basis that the jury's verdicts finding him guilty of aggravated battery and not guilty of armed violence are legally inconsistent because both verdicts were based on the same elements and arose out of the same facts. Further, he contends the jury's verdicts finding him guilty of aggravated battery and reckless conduct, as the result of the same conduct, are legally inconsistent and void because each offense requires a different mental state and the two mental states cannot co-exist. The defendant did not specifically raise these issues in his post-trial motion; nevertheless we shall consider the merits pursuant to Supreme Court Rule 615(a). Ill. Rev. Stat. 1979, ch. 110A, par. 615(a); see also *People v. Roman* (1981), 98 Ill. App. 3d 703, 706.

Before finding the defendant guilty of aggravated battery and not guilty of armed violence, the jury had been instructed:

"A person commits the crime of aggravated battery, who, in committing a battery uses a deadly weapon." (Illinois Pattern Jury Instructions, Criminal, No. 11.09 (2d ed. 1968).)

Further, the jury had been instructed that:

"A person commits the crime of armed violence when, while armed with a dangerous weapon, he commits any felony as defined by Illinois law.

The offense of Aggravated Battery is a felony as defined by Illinois law." No IPI Criminal instruction existed at that time; the instruction given was based on section 33A—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2).

Thus, defendant claims he was both acquitted and convicted on the same elements and, he contends, the verdicts are therefore legally inconsistent, and a reasonable doubt of his guilt has been raised which requires reversal. In support of this claim, defendant takes the position that it is uncertain whether *People v. Dawson* (1975), 60 Ill. 2d 278, overrules

*People v. Hairston* (1970), 46 Ill. 2d 348. However, a recent Illinois case positively construes *Dawson* as implicitly having overruled *Hairston*, and we believe that case, *People v. Johnson* (1980), 87 Ill. App. 3d 306, is dispositive of this issue.

In *Johnson*, the defendant was likewise convicted of aggravated battery and acquitted of armed violence, and contended reversal due to the legal inconsistency of the verdicts was required. The *Johnson* court disagreed, stating:

> "We believe that *Dawson* did implicitly overrule *Hairston* on the necessity for legal consistent verdicts * * *.
>
> * * *
>
> It appears that the legislature intended, in passing the armed violence statute, to create an additional offense for which a defendant could be charged and convicted when he committed any felony while armed with a specific type of dangerous weapon. Therefore, armed violence and aggravated battery are two separate offenses. Thus, the verdicts here are legally consistent, if not logically so. [Citation.]
>
> But even assuming the verdicts were legally inconsistent, we have held that Illinois does not require legal or logical consistency in verdicts. And that such inconsistency, even if it exists, does not require reversal of defendant's conviction. [Citation.] As our supreme court stated in *Dawson*:
>
>> '* * * [A]llowing inconsistent verdicts in criminal trials runs the risk that an occasional conviction may have been the result of compromise. But the advantage of leaving the jury free to exercise its historic power of lenity has been correctly thought to outweigh that danger. [Citations.]' 60 Ill. 2d 278, 281, 326 N.E.2d 755, 757." (87 Ill. App. 3d 306, 309-10.)

See also *People v. Depper* (1980), 89 Ill. App. 3d 135, 138; *People v. Jimerson* (1979), 69 Ill. App. 3d 403, 409-11; *People v. Murray* (1975), 34 Ill. App. 3d 521, 537.

■■ Consequently, even if the jury's verdicts on aggravated battery and armed violence were legally inconsistent, reversal would not be warranted since such inconsistency may simply have been the result of the jury's free exercise of its "historic power of lenity."

With regard to the defendant's convictions for aggravated battery and reckless conduct, he argues the inconsistent verdicts rule of *Dawson* is inapplicable, since there is no question of the jury finding the defendant simultaneously guilty and not guilty of offenses which are comprised of the same elements. Clearly, convictions for aggravated battery and reckless conduct require proof of different degrees of culpability, and reckless

conduct can be a lesser included offense of aggravated battery. (*People v. Perry* (1974), 19 Ill. App. 3d 254.) It is true, as defendant argues, that the same act toward the same individual cannot be committed with two different mental states at the same time. (See *People v. Gross* (1977), 52 Ill. App. 3d 765, 771-73.) However, as pointed out by the State, a defendant can be guilty of both aggravated battery and reckless conduct toward the same individual if there are distinguishable variations in conduct. In support, the State cites *People v. Roman* (1981), 98 Ill. App. 3d 703, wherein the court found that the verdicts against the defendant for aggravated battery and reckless conduct were not inconsistent, since the jury could rationally have concluded that the defendant had different states of mind when he fired several shots at the victim.

■■ Assuming, *arguendo*, as urged by the defendant, that our analysis of the issue should be limited to the cuts on Figueroa's hands as specified in the information charging aggravated battery, we believe the jury in the instant case could likewise have rationally concluded that the defendant had different states of mind when the wounds were inflicted on the victim's hands. The jury could have believed that the defendant knowingly slashed out at Figueroa in his anger at having the door slammed in his face, and that the other cuts on Figueroa's hands were the result of the ensuing struggle during which the defendant was still holding the knife and Figueroa was trying to grab it from him. Consequently, we find the verdicts are not void. We will, however, vacate the defendant's conviction for reckless conduct because it is a lesser included offense of aggravated battery, and also because our reading of the record shows that a sentence of probation for only aggravated battery was imposed. The defendant was admonished by the trial court at sentencing about the more serious consequences of violating felony probation as opposed to misdemeanor probation; accordingly, it appears the court did not intend to sentence the defendant for the reckless conduct conviction, nor could it properly have done so because it was an included offense. See *People v. King* (1977), 66 Ill. 2d 551, 556.

The final issue is whether the court erred in not suppressing the physical evidence obtained in the search of the apartment. Defendant's argument begins with the premise that the entry in the instant case was one to search, and not to arrest. He finds, therefore, that factors such as the likely destruction or removal of evidence, inherently dangerous evidence (*e.g.*, explosives), search incident to a lawful arrest, hot pursuit, or the protection of property are the types of exigencies required to pass constitutional muster. He notes that should we determine that the entry was to arrest, not search, his position is that the State failed to show exigent circumstances existed which would have justified the warrantless arrest under *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639,

100 S. Ct. 1371, and *People v. Abney* (1980), 81 Ill. 2d 159. Both those cases held that in the absence of exigent circumstances, a warrantless entry of a private residence to effect an arrest is constitutionally prohibited.

The State's answer brief treats the entry as one to arrest, not to search, and proceeds directly to an analysis of the issue in light of *Abney*, concluding the warrantless entry was justified. We find no error in the State's approach and concur in this initial conclusion. The warrantless police action in the instant cause was first and foremost an entry into a private residence for the purpose of making an arrest. In order to justify such an entry, there must be probable cause, and there must also be exigent circumstances.

The *Payton* court had found persuasive Judge Leventhal's reasoning in *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385, wherein:

"He reasoned that the constitutional protection afforded to the individual's interest in the privacy of his own home is equally applicable to a warrantless entry for the purpose of arresting a resident of the house; *for it is inherent in such an entry that a search for the suspect may be required before he can be apprehended.* Judge Leventhal concluded that an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection." (Emphasis added.) *Payton v. New York* (1980), 445 U.S. 573, 588, 63 L. Ed. 2d 639, 652, 100 S. Ct. 1371, 1381.

After *Payton*, our supreme court considered the impact of that decision with relation to Illinois' arrest statute. (*People v. Abney* (1980), 81 Ill. 2d 159; Ill. Rev. Stat. 1979, ch. 38, par. 107—1 *et seq.*) In *Abney* the court observed:

"In *Coolidge*, the court had ruled that warrantless searches are unconstitutional in the absence of exigent circumstances [citation], and four members of the courts, in *dicta*, expressed the opinion that the same exigency requirement is applicable to warrantless entries to arrest [citation]. In *Payton*, the court adopted the view of those four justices, holding that a warrant is required to support a nonexigent entry into a private residence for the purpose of effecting a felony arrest." 81 Ill. 2d 159, 166.

The *Abney* court went on to determine that the Illinois arrest statute, as judicially construed, complies with the constitutional guidelines enunciated in *Payton* since the principal of the exigent circumstances rule had been impliedly observed in past Illinois decisions and that the requirements of the rule had therefore been "judicially engrafted" upon the statute. (81 Ill. 2d 159, 167-68.) Despite the State's attempt in the instant

cause to suggest otherwise, it is clear that the rule enunciated in *Payton* does apply here since, according to *Abney*, that rule is nothing new in Illinois: in addition to probable cause, exigency factors were found to be present in prior Illinois cases where warrantless entries to arrest had been upheld. 81 Ill. 2d 159, 167-68.

Although *Payton* did not, *Abney* did discuss the factors to be considered in determining whether warrantless entry to arrest was necessitated by exigent circumstances. These factors are considered here in relation to the facts of the instant cause. First, the offense was relatively recent, suggesting a need for prompt action. The victim's first contact with the police came only minutes after he fled bleeding from Sharlotte's apartment. *Abney* considered a similar report from a beating victim to police made within 1½ hours to be " 'within the spirit * * * of the "hot pursuit" exception.' " (81 Ill. 2d 159, 169.) Clearly, the instant facts are encompassed within the spirit of this exception as well. Second, there was no deliberate or unjustified delay by officers during which time a warrant could have been obtained. The only delay here between the victim's first contact with the police and their entry into the apartment to arrest was that necessary to secure the services of a Spanish-speaking officer, medical attention for the victim's wounds, and backup officers. We believe these delays were justified under the circumstances. Third, the need for prompt action was further made apparent by the belief that the suspect was armed and exhibited some sign of a violent character. Although the defendant was not armed with a gun, he quite obviously was armed with a knife. The victim's bruises, bumps and cuts were vivid evidence of the suspect's violent character.

The *Abney* court then also found the exigent circumstances in that case were enhanced by "other factors * * * which suggest that the officers acted reasonably." (81 Ill. 2d 159, 171.) These "reasonableness" factors, with reference to the instant facts, were that first, there was a clear showing of probable cause based on reasonably trustworthy information. The victim, an ordinary citizen, had obviously been physically attacked, and was able to describe to the police the circumstances under which his injuries occurred. Second, although the defendant here was not clearly named as the assailant, the victim was able to locate the building and the exact apartment in which the offense allegedly occurred. Further, although the victim did not know whether the defendant lived in the apartment, Stinnette most certainly did, and the warrantless police entry was made for the purpose of arresting her as well as the defendant. Third, there was strong reason to believe the perpetrators were in the premises entered. As they approached the building in question, the police in the presence of the victim observed two black persons (although not specifically identifiable at that time as either men, women, or a man and a

woman) in an upstairs apartment window which was identified by the victim as being the apartment where the attack took place. Entering the building through an unlocked door and approaching the door of the apartment, the police saw light and heard loud music. One of the officers heard a woman's voice as well. Considering the relatively short amount of time that had passed between the attack and the approach to the apartment, we believe there was strong reason to believe the suspects were present. Fourth, the entry was peaceful. That the entry here was peaceful was not disputed. It was so peaceful, in fact, the issue of consensual entry has arisen. As defendant argues, however, Stinnette's "mere acquiescence to police authority does not necessarily establish consent" *(People v. Montgomery* (1980), 84 Ill. App. 3d 695, 701), and we do not find that the entry here was consensual.

Assessing all of the above factors together, we conclude the warrantless entry to arrest pursuant to probable cause and exigent circumstances was not violative of the fourth amendment. Once the police were inside the apartment and became aware that Stinnette's boyfriend, Ken Anderson, was not the black man who attacked Figueroa, they were justified in continuing the search for her confederate.

■■ In his "Search and Seizure, A Treatise on the Fourth Amendment," Professor LaFave discussed the propriety of actions taken after an arrest has been made. He notes three basic actions: searches into or examination of other areas of the premises first, to insure the safety of the officers, referred to as the "protective sweep"; second, to find potential accomplices of the arrestee; and third, as a consequence of movement about the premises by the arrestee. (2 W. LaFave, Search and Seizure §6.4 (1978).) Certainly, once Stinnette was arrested, and Anderson discovered in the bedroom, the police were warranted in looking further for the man who attacked Figueroa. We believe the search was properly extended to include the basement, since the apartment back door was slightly ajar and the stairs led almost directly down into the basement area. In our opinion, the entry to arrest was justified and the trial court properly denied the defendant's motion to quash his arrest.

With regard to the extent of the search conducted and the items seized, additional exigency factors must be present before the requirement of a warrant may be excused, and the burden of showing the existence of the exception which proves the rule belongs to the party seeking it. *(People v. Rinaldo* (1980), 80 Ill. App. 3d 433, 434.) Therefore, it was the State's burden to prove the warrantless search was justified either because it was (1) incident to a custodial arrest, and was limited in scope to the area of the arrestee's immediate control *(Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034), or (2) that it was a search conducted under the "emergency doctrine" exception; that is, the

evidence would be lost or destroyed if the search was delayed to obtain a warrant (*Vale v. Louisiana* (1970), 399 U.S. 30, 26 L. Ed. 2d 409, 90 S. Ct. 1969); or (3) that the search was consensual (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041). Additionally, items inadvertently discovered in plain view in a place where the police have a right to be may be seized if there is probable cause to believe they constitute the proceeds or instrumentality of a crime. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022.

The defendant's motion to suppress sought suppression of "any and all tangible or intangible evidence as the result of the illegal arrest, search or seizure." His motion was denied after a hearing. On appeal, defendant specifically argues that the victim's rings, $15 in currency, photographs taken in the apartment, and the knife should have been suppressed because the entry was not pursuant to a valid warrant or within the recognized exceptions.

■■ The State argues the search was justified under the "emergency doctrine" in that the evidence would have been removed or destroyed before a warrant could be obtained. It cites *United States v. Rubin* (3d Cir. 1973), 474 F.2d 262, in support of its position. We find *Rubin* distinguishable on its facts. In that case, a suspect being followed by agents made a drop-off of a crate agents knew contained narcotics. Shortly thereafter, the suspect was apprehended, and several agents were dispatched to seek a warrant to search the premises where the crate had been left. The arrestee then began shouting to nearby spectators to call his brother. Fearing destruction of the evidence, agents proceeded immediately to conduct a warrantless search of the premises, and that warrantless search was upheld. The State's prime contention that Ken Anderson would likely have destroyed or removed the evidence is wholly without support in the record. In fact, the report of the preliminary hearing in this cause directly contradicts the assertion in the State's brief that Ken Anderson was not arrested. The record shows Anderson was also arrested the same time Harris and Sharlotte were, but only for possession of a hypo unrelated to the robbery. That aside, no evidence was introduced at the suppression hearing or during trial which indicated positively that Anderson was present in the apartment during the robbery, or whether he knew anything about the robbery if, as defendant contends, he was present but asleep in the bedroom. In our opinion, the State failed to meet its burden of showing that the warrantless search was justified by any of the recognized exceptions, and that it was error for the court below not to suppress these items. However, it is also our opinion that the introduction of these items did not prejudice the defendant and, therefore, the error was harmless beyond a reasonable doubt. Although the items sought to be suppressed may have caused the jury to believe the victim's testimony against the

defendant, it is clear it did not believe all of it since it failed to convict the defendant for either armed robbery or armed violence. Furthermore, the items sought to be suppressed were all consistent with the defendant's own testimony. He never denied that he held the knife which cut Figueroa, nor that he had taken $15 and Figueroa's two rings to the basement. The evidentiary items were as consistent with defendant's innocence as his lack of it. Consequently, reversal on this basis is not warranted.

The defendant's conviction for reckless conduct is hereby vacated; and the judgment of the circuit court of Lake County is affirmed.

Judgment vacated in part and affirmed in part.

HOPF and LINDBERG, JJ., concur.