THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VINCENT C. WATKINS, Defendant-Appellant.

First District (2nd Division)   No. 1—90—0871

Opinion filed November 4, 1992.

Rita A. Fry, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McCORMICK delivered the opinion of the court:

Defendant, Vincent C. Watkins, was charged with attempted armed robbery, attempted robbery and aggravated unlawful restraint. A jury found defendant not guilty of attempted armed robbery and attempted robbery, but guilty of aggravated unlawful restraint. The trial court entered judgment on the verdicts. The trial court denied defendant's motion for a new trial and sentenced defendant to 30 months' probation, with the first six months to be served in the Department of Corrections.

On appeal, defendant argues that (1) the State did not prove him guilty beyond a reasonable doubt of aggravated unlawful restraint; (2) the trial court abused its discretion in refusing to allow defendant to reopen his case to perfect impeachment of a State's witness; and (3) the State violated his fifth and fourteenth amendment rights when the State introduced evidence that made reference to defendant's post-arrest silence. We affirm the decision of the trial court because there was ample evidence to prove defendant's guilt beyond a reasonable doubt, there are no facts or circumstances that require the trial court to reopen the case, and defendant's constitutional rights were not violated.

At trial, Raymond Boyd testified that on February 6, 1989, he worked as a security guard at an Illinois Bell Telephone Company bill payment center located at 4133 West Madison. Boyd was in uniform, but he did not carry a gun, only handcuffs. Boyd's duties included giving information to customers and maintaining crowd control. There were approximately 60 to 80 people waiting in an S-curved line to pay their bills.

Boyd testified that at approximately 11 a.m., he saw defendant standing in the doorway of the payment center, wearing work pants, boots and a field jacket. Defendant approached Boyd and

said something to him, but he could not hear defendant because of the noisy crowd and did not respond. Defendant pulled out a pistol with a black or bluesteel barrel, pushed it into Boyd's ribs and put his left arm around his shoulder holding him close. Defendant said, "Let's go up to the front and get the money." As defendant proceeded to walk, Boyd took a short step and pushed the gun out of his ribs. Boyd began to struggle with defendant. Defendant hit Boyd on the forehead, jaw and shoulder several times. They fell to the floor during their struggle and Boyd saw an object fly away.

Boyd further testified that as he and defendant continued to struggle, a man stepped out of the crowd pointing a .357 magnum at defendant. Boyd wrestled defendant to the ground, handcuffed him and held him in a corner of the room until the police arrived. Boyd testified that he was injured from being hit with the gun.

Detective James Capesius testified that he spoke with Boyd on February 6, 1989. He noticed a bruise and swelling on the left side of Boyd's head. He also testified that the gun was in the same condition at trial as it was on the day of the incident.

Officer James Gibson testified that on February 6, 1989, he responded to a simulcast on the radio that a man had a gun at the location of the bill payment center. When Gibson arrived at the center, he saw that Boyd had defendant in custody. Gibson spoke with Boyd, but not with defendant. He removed defendant from the center.

Gibson identified the weapon that was recovered from the scene as a flintlock-type, cap-and-barrel type pistol with the barrel missing. According to Gibson, the gun could still be fired without the barrel, but the shot would not be accurate. Gibson did not have a chance to search the area for the missing barrel.

Jessie Jones testified that he was at the bill payment center on February 6, 1989, at approximately 11 a.m. Jones stood sideways about six feet from the door. He saw defendant enter the center wearing a long coat, with a long beard and a big smile. When Jones turned around, defendant was at Boyd. Jones saw a gun in defendant's hand when Boyd and defendant started "tussling." Jones testified that he saw defendant hit Boyd with the gun and saw him put the gun in Boyd's rib cage.

James Randle testified for defendant that when Randle was at the bill payment center on February 6, 1989, he saw Boyd draw a gun from underneath his coat. He saw Boyd and defendant "tussling" and then Randle saw an unidentified man holding a .357 magnum on defendant while Boyd handcuffed defendant. Randle

was familiar with defendant from the neighborhood, but did not tell the police what he saw.

Defendant testified that he worked for the Chicago Board of Education as a substitute teacher. He went to the bill payment center on February 6, 1989, to inquire about phone service for his new apartment. He had neither money, credit cards nor checks with him. Defendant entered the center and walked over to Boyd and asked him if he could get new phone service. Boyd ignored him, so he repeated his question in a louder voice. Boyd called him an "asshole" and made a motion to his side and pushed defendant. After they began to struggle, Boyd pulled out a gun. Defendant was subdued and later arrested by the police.

Dr. Roosevelt Brasser, the coordinator of the Bureau of Employment Eligibility for the Chicago Board of Education (the Board), testified that defendant was not a substitute teacher. He said that defendant did not work for the Board because his teaching license had expired on August 31, 1989. He also testified that defendant must wait a year before his license could be reissued because defendant canceled his teaching permit and withdrew his pension contributions. Defendant reapplied for his teaching permit prior to trial.

■ Defendant initially contends that the State failed to prove him guilty beyond a reasonable doubt of aggravated unlawful restraint. He argues that since the jury found him not guilty of attempted armed robbery and attempted robbery, it is improbable and contrary to human experience for him to be guilty of aggravated unlawful restraint. He claims that his acquittal of the other charges means he had no motive for holding Boyd.

Contrary to what defendant argues, motive is not an element of the offense of aggravated unlawful restraint. The jury was not required to find that defendant had a reason to detain Boyd. It was sufficient that while using a deadly weapon, defendant detained the victim without legal authority. If the jury's verdicts were inconsistent, "reversal would not be warranted since such inconsistency may simply have been the result of the jury's free exercise of its historic power of lenity." *People v. Harris* (1982), 104 Ill. App. 3d 833, 840, 433 N.E.2d 343.

■ Defendant also maintains that reasonable doubt was created because of inconsistencies in the State's case. He contends that Detective Capesius' contradiction of Boyd's claimed injuries creates reasonable doubt. Detective Capesius testified that when he saw Boyd, Boyd had a bruise on his head and some swelling. Boyd testi-

fied that he had knots on his head, blood in two or three places on the top of his head and blood behind the ear.

A complainant's testimony does not have to be unimpeached, uncontradicted, crystal clear or perfect to be clear and convincing. (*People v. Douglas* (1989), 183 Ill. App. 3d 241, 251, 538 N.E.2d 1335, citing *People v. Findlay* (1988), 177 Ill. App. 3d 903, 532 N.E.2d 1035.) Complainant's story may be clear and convincing as long as the discrepancies do not detract from the reasonableness of his story as a whole. (*Douglas*, 183 Ill. App. 3d at 252.) Even though Detective Capesius' description of Boyd's injuries differs from Boyd's, the inconsistencies do not detract from the reasonableness of Boyd's story as a whole.

Defendant further argues that reasonable doubt exists because of inconsistencies in Jones' testimony regarding how far Boyd stood from the door when defendant approached Boyd. It was Boyd's testimony that he stood approximately 10 to 15 feet from the door. Jones testified that Boyd stood two to three feet from the door. Defendant maintains that the inconsistencies lend doubt to Jones' credibility. The assessment of the credibility of witnesses is for the jury to weigh. (*People v. Williams* (1982), 93 Ill. 2d 309, 315, 444 N.E.2d 136.) A reviewing court will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, citing *People v. Stringer* (1972), 52 Ill. 2d 564, 568, 289 N.E.2d 631.) In the instant case, Jones' testimony, including its inconsistencies, is not so improbable as to raise a reasonable doubt of guilt.

■ The relevant question on review, when faced with a challenge to the sufficiency of the proof, "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.

Aggravated unlawful restraint results when a person knowingly, without legal authority, detains another while using a deadly weapon. (Ill. Rev. Stat. 1989, ch. 38, par. 10—3.1.) Proof of defendant's seizure and detention of the victim with a gun and without legal authority is sufficient to establish guilt of aggravated unlawful restraint. Boyd testified that defendant held him while using a pistol. In *People v. Algarin* (1990), 200 Ill. App. 3d 740, 751, 558 N.E.2d 457, defendant grabbed his child and pulled his knife from his waistband. The appellate court concluded that the circumstances

clearly supported the jury's conviction of defendant for aggravated unlawful restraint. Similarly, the evidence in the case at bar clearly supports defendant's conviction for aggravated unlawful restraint.

■ Defendant's next contention is that the trial court erred in not allowing him to perfect impeachment of Jones. During direct examination, Jones testified that he did not see defendant speak to Boyd at the payment center. On cross-examination, Jones testified that he did not remember telling a police officer that he saw defendant say something to Boyd after approaching him.

Defendant did not call the police officer as a witness in order to perfect the impeachment of Jones. After the close of the evidence, the State moved to strike the defense questions of Jones on the alleged conversation based on defense counsel's failure to perfect impeachment. Defendant moved to reopen the proofs and recall the policeman, who had already left the courtroom. The trial court denied defendant's motion and struck the cross-examination, telling defense counsel that it was his obligation to have brought the officer in. Defendant contends that this was reversible error.

"It is in the sound discretion of the trial court whether a case may be [re]opened for further evidence *** [and] this discretion will not be interfered with except where it is clearly abused." *People v. Cross* (1968), 40 Ill. 2d 85, 90, 237 N.E.2d 437.

> "In considering a motion to reopen proofs, a trial court should take into account various factors, including the existence of an excuse for the failure to introduce the evidence at trial, *e.g.*, whether it was inadvertence or calculated risk; whether the adverse party will be surprised or unfairly prejudiced by the new evidence; whether the evidence is of utmost importance to the movant's case; and whether there are the most cogent reasons to deny the request." *Hollembaeck v. Dominick's Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 778, 484 N.E.2d 1237.

In the case at bar, defense counsel did not present an excuse for his failure to recall a police officer to impeach Jones. Jones' testimony regarding the alleged conversation is not of the utmost importance to defendant's case. There is no dispute as to whether defendant said anything to Boyd. Boyd testified that defendant said something to him, but that he could not hear him.

Defendant relies on *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31, and *People v. Gray* (1991), 209 Ill. App. 3d 407, 568 N.E.2d 219, to support his position. The instant case is clearly distinguishable from *Cobb* and *Gray* because in those cases the defend-

ants sought continuances to recall witnesses so that they could lay proper foundations for impeaching. In the case at bar, both sides rested and defendant sought leave to reopen his case. The trial court did not err in refusing to allow defendant to reopen his case.

■ Defendant's last contention is that the State introduced evidence that violated his fifth amendment right to remain silent and denied him due process of law in violation of the fourteenth amendment. The defendant refers to questions that the State asked Officer Gibson, who testified to what happened once he arrived on the scene. The following line of questioning took place:

"MR. FEERICK [Assistant State's Attorney]: How was Mr. Boyd keeping Mr. Watkins in custody?

A. He had him restrained with handcuffs.

Q. And when you arrived, did you have a conversation with anyone?

A. I approached Mr. Boyd. I recognized him immediately as being a security officer. I approached him and asked him what was going on.

Q. At that time did you have a conversation with him?

A. Yes, I did.

Q. Did you ever have a conversation with the defendant, Mr. Watkins?

A. No, I did not."

Defendant contends that his constitutional rights were violated because it is improper for the State to introduce evidence of a defendant's post-arrest silence whether he has been given *Miranda* warnings or not. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.) Defendant in *Doyle* maintained for the first time at trial that he was framed. The prosecutor tried to impeach that defendant by asking him why he failed to tell the police that he was framed when he was arrested. The State argued that defendant's silence at his arrest gave rise to an inference that the frame-up story was fabricated. The Court rejected the State's position, holding that it was fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently given at trial. (*Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) In *Beller*, the Illinois Supreme Court held that prosecutorial comments on that defendant's failure to offer his exculpatory explanation at the time of his arrest was error. *Beller*, 74 Ill. 2d at 525.

260

In this case, there is no evidence that Officer Gibson asked defendant questions and that he refused to answer. The record does not reflect that defendant made statements upon his arrest and subsequently gave an exculpatory explanation at trial. Contrary to defendant's claim, his fifth and fourteenth amendment rights were not violated.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SCARIANO and DiVITO, JJ., concur.