THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL COLLIER, Defendant-Appellant.

First District (5th Division)    No. 1—99—3317

Opinion filed March 29, 2002.

REID, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Suzanne T. Collins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Michael Collier was convicted of first degree murder and attempted first degree murder. He was sentenced to consecutive prison terms of 40 and 15 years, respectively. On appeal, defendant contends that the trial court erred in denying his motion to reopen his case after he had rested so that he could testify. He also contends that his consecutive prison terms are unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). For the reasons set forth below, we affirm defendant's convictions and sentence.

## BACKGROUND

Vontain Mercier testified that about 4 p.m. on September 3, 1997, he was with Cornelius Washington at Fernwood Park, which is located near 104th and Wallace in Chicago, waiting to play basketball when they heard gunshots and began to run. Immediately prior to hearing the gunshots, Vontain saw defendant, whom he did not know at the time, sitting on a bench drinking a beer. Vontain also stated that he noticed a blue van with gray trim in the park's parking lot. After hearing the shots, Vontain saw a second man run to the blue van.

After leaving the park, Vontain and Washington eventually went to Vontain's house, located at 10141 South Wallace. While standing in front of the house with his brother, Dionte Mercier, Dion Wadley and Washington, Vontain saw defendant driving the blue van he had seen earlier at Fernwood Park. Defendant gave a "tough look" in the direction of the four on the street, pulled over and got out of the van. Defendant screamed something, which Vontain made out as "What's up?" and approached. When about 25 feet from them, defendant fired in the direction of Vontain and the others. Vontain stated that he heard about 15 shots fired. Washington, who was shot in the chest, died as a result of his wounds. Dionte was struck in the leg.

Later that night, Vontain was taken by police to 100th and Aberdeen, where he identified a van as the one defendant was driving prior to the shootings. About 11 p.m. the same night, Vontain identified defendant in a police lineup. In the same lineup, Vontain also identified John Clark as someone he had seen earlier that day at Fernwood Park. In open court, Vontain identified defendant as the person who shot Washington.

Dionte testified that, at the relevant time, he was standing on the curb with Vontain, Washington and Wadley talking when he saw de-

fendant, whom he had never previously seen, approach driving a blue van traveling around 10 miles an hour. When the van stopped, defendant exited the driver's side, which was the side of the van closest to Dionte, and loudly asked, "What's up with that shit at the park?" Dionte stated that there was a passenger in the van who never got out of the vehicle. Defendant, from about 30 feet away, then raised his right arm and fired six or seven shots in rapid succession at the four men on the street. In response, they fled the scene. While running, Dionte fell and realized that he had been shot in the right leg. After making it back to the house, Dionte heard a second round of about 12 shots fired, followed by the voice of Sammie Lee Skyles, his neighbor, yelling "Get the license plate."

Dionte was taken to Roseland Hospital by ambulance where his leg wound was treated. Later that evening, after being released from the hospital, Dionte viewed a police lineup. Both in open court and at the lineup, Dionte identified defendant as the driver of the van. In the same lineup, he identified Clark as defendant's passenger in the van. Although he did not know Clark's name at the time of the lineup, he recognized him as someone with whom he had previously played basketball.

Travis Morgan, who had a case involving an alleged assault pending at the time of defendant's trial, stated that on the date in question, he lived across the street from the Merciers. About 6 p.m. that evening, he was in front of his house while Dionte, Vontain and two others were standing near the Mercier home. At that time, Morgan saw a van driving down the street toward his home. A man, whom Morgan identified in open court as defendant, got out of the van and began shooting at the four men standing in front of the Mercier home until he appeared to be out of bullets. Defendant then got into the van and coasted to a nearby corner. Once there, defendant got out of the van, appeared to reload the gun and began shooting at Morgan's neighbors, who had attempted to get the van's license plate number. Later that evening, Morgan identified defendant in a police lineup as the person who had exited the van and fired the shots.

Officer Lynn Lopit of the Chicago police department testified that she and her partner arrived at the crime scene about 7 p.m., where they recovered one .45-caliber cartridge casing at 10137 South Wallace and three .38-caliber cartridge casings near 102nd and Wallace. After inventorying the casings, they proceeded to 100th and Aberdeen, where they had been told that a van used during the shooting was located. There, they found the blue van, from which they recovered a bloody shirt and two .38-caliber cartridge casings. No weapons were found in the van. Testing performed by a forensic scientist specializing

in firearms identification revealed that all five .38-caliber casings recovered the day of the shootings were fired from the same weapon.

Sammie Lee Skyles testified that on September 3, 1997, she lived with her family at 10151 South Wallace. About 6 p.m. that day she heard gunshots and went to her front door, where she saw people running down the street. Near the corner of 101st and Wallace, Skyles saw her son and daughter. After Skyles shouted to her children to get the license plate number to the van, the person driving it got out and asked, "[Y]ou want the license plate number, humm?" He then stated, "[H]ere it is," and began shooting. Skyles was unable to see the face of the shooter.

Officer Michael Sweeney testified that he arrived at the crime scene shortly after 6 p.m. and conducted interviews with witnesses. With the information he had gathered, Sweeney began looking for an older model, gray Chevrolet conversion van with blue trim and a Minnesota license plate. After receiving a radio message, Sweeney went to 10023 South Aberdeen, where, at about 6:45 p.m., he saw a van fitting the description he had been given. Inside the van were two black males. As Sweeney and his partner approached, the person in the passenger seat fled. Defendant, who was sitting in the driver's seat, then got out of the van. Sweeney saw a spent shell casing on the stepboard of the van, arrested defendant and advised him of his rights.

Initially, defendant denied being at the park and stated that he was not involved in the shootings. But, when questioned about the bloody shirt in the van, defendant, who did not appear to have been shot, stated that he had been at Fernwood Park. He further stated that in exchange for $4, he had given a friend, who had been shot at the park, a ride to a hospital. When questioned about the van, defendant stated that he owned it and that he was the only person who had access to it.

After the State rested, the parties stipulated that if called to testify, Detectives Fassl and Almazan would state they spoke with Dionte at Area 2 police headquarters about 10:55 p.m. the night of September 3, 1997, and that he identified Clark as being with defendant at the time of the shooting. It was further stipulated that the detectives would testify that they spoke with Vontain at Area 2 the same night and were told by him that both the driver and passenger had gotten out of the van before the shooting. It was also stipulated that Vontain identified Clark as being with defendant when defendant did the shooting.

Following these stipulations, the defense rested. After dismissing the jury for lunch, the following exchange occurred:

"THE COURT: Mr. Collier, I want to address you for a moment here regarding the case. Your attorney just rested the case, and I

want to advise you that you have a right to testify in this case if you want to. You also have a right not to testify. That has to be your decision.

Do you understand what I am saying?

DEFENDANT COLLIER: Yes.

THE COURT: Is it your decision that you don't want to testify in this case?

DEFENDANT COLLIER: Yes."

After the lunch break the instructions conference was held. Soon after it began, the following was stated:

"[DEFENSE COUNSEL]: Judge, my client claims he's changed his mind. I know we rested. He may choose to testify. It may be too late.

THE COURT: Find out right now."

Defense counsel then told the court, "He is not going to testify." The record does not reflect whether counsel spoke to defendant prior to informing the court that defendant would not testify.

At the conclusion of the instructions conference, this colloquy occurred:

"[DEFENSE COUNSEL]: Another matter that I bring to the Court's attention is, my client has indicated that he has had a change of heart. I would ask if we can re-open our case for the Defendant to testify.

THE COURT: Based upon my earlier talk with the Defendant, that request is denied at this time."

Final arguments were heard, and after being instructed, the jury found defendant guilty of the first degree murder of Washington and the attempted first degree murder of Dionte. He was sentenced to a 40-year prison term for the first degree murder conviction and a consecutive 15-year term for the attempted first degree murder conviction. Defendant now appeals.

## ANALYSIS

Defendant first contends that the trial court erred in refusing to allow him to testify at his trial.

The State asserts this claim of error is waived on appeal based upon defendant's failure to object to the trial court's denial of his request to reopen his case and for his failure to raise the issue in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Despite his failure to properly preserve the issue for review, defendant argues that we should consider the alleged error on appeal under the plain error doctrine because consideration of the issue is necessary in order to preserve the integrity of the judicial process.

■ Plain error is a limited and narrow exception to the general

waiver rule, to be used only where the evidence is closely balanced or the alleged error is so substantial that it deprived the defendant of a fair trial. *People v. Kuntu*, 196 Ill. 2d 105, 128 (2001). "This second prong of the plain error exception is to be invoked only where the possible error is so serious that its consideration is 'necessary to preserve the integrity and reputation of the judicial process.' " *People v. Hampton*, 149 Ill. 2d 71, 102 (1992), quoting *People v. Herrett*, 137 Ill. 2d 195, 214 (1990). "The right of a criminal defendant to testify in his own behalf at his trial is a fundamental constitutional right." *People v. Piper*, 272 Ill. App. 3d 843, 846 (1995). Thus, we agree with defendant that review of this issue is necessary so as to ensure the integrity of the judicial process.

■ Only under the most extreme circumstances should the trial court exclude defense testimony. *People v. Johnson*, 151 Ill. App. 3d 1049, 1053 (1987), citing *People v. Franceschini*, 20 Ill. 2d 126 (1960). When deciding whether to allow a defendant to reopen his case so that he can testify in his own behalf, it is proper for the trial court to consider various factors, including: (1) the timeliness of the motion to reopen; (2) the character and importance of the testimony to be presented; (3) the effect of granting the motion, in particular, whether the State is prejudiced; and (4) the reasonableness of the explanation for the defendant's failure to present the evidence in his case in chief. *People v. Watkins*, 238 Ill. App. 3d 253, 258 (1992). It is within the trial court's sound discretion as to whether a case may be reopened for further evidence, and unless that discretion is clearly abused, reversal will not result. *People v. Figueroa*, 308 Ill. App. 3d 93, 101-02 (1999).

■ In the instant case, as defendant did not testify before resting his case, it may be surmised that defendant did not wish to testify in his own behalf at that time. See *People v. Enis*, 194 Ill. 2d 361, 399 (2000). A brief time later, although not required to do so, the trial court admonished defendant as to his right to testify. See *People v. Smith*, 176 Ill. 2d 217, 235 (1997) ("the trial court is not required to advise a defendant of his right to testify, to inquire whether he knowingly and intelligently waived that right, or to set of record defendant's decision on this matter"). After defendant indicated that he understood the admonishments, the trial court asked defendant if it was his desire not to testify at trial, to which defendant responded, "Yes." Following a recess for lunch and the start of the instructions conference, defense counsel informed the trial court that defendant had "changed his mind" with respect to his decision not to testify. Based upon our review of the record, the trial court's instructing defense counsel to "[f]ind out right now" was a third opportunity defendant was given to testify. In response, defense counsel informed the trial court that defendant

did not wish to testify. Only after yet another "change of heart" did the trial court deny defendant's request to testify. In short, defendant turned down three opportunities to testify before the trial court denied his request to reopen his case.

In *People v. Frieberg*, 305 Ill. App. 3d 840, 851 (1999), the defendant argued that the trial court erred in denying his postconviction petition because he received ineffective assistance of trial counsel when that counsel allegedly usurped the defendant's constitutional right to choose whether to testify in his own behalf at trial. This court held that the trial court did not err in denying the postconviction petition and provided guidance to the trial courts by stating as follows:

> "In so holding, we note that because the decision whether to testify at trial lies ultimately with a defendant, issues involving how that decision was made lurk—like an unexploded bomb—in every case resulting in a conviction. As the supreme court noted in *People v. Brown*, 54 Ill. 2d 21, 24, 294 N.E.2d 285, 287 (1973), 'in every case in which the issue is raised, the lawyer's advice will in retrospect appear to the defendant to have been bad advice.' Thus, convicted defendants who testified on their own behalf at trial often will later claim that doing so was not their personal choice and their trial counsel forced them to testify. On the other hand, defendants who did not testify at trial often will later claim that they really wanted to testify but their trial counsel prevented them from doing so.
>
> To defuse this explosive situation, we urge trial courts *in every criminal case* to take the few seconds needed, after the State has rested its case in chief and before the presentation of the defense case, to admonish the defendant personally that he alone possesses the right to choose whether to testify on his own behalf, and that he should make that decision after consulting with counsel." (Emphasis in original.) *Frieberg*, 305 Ill. App. 3d at 852.

This court said that by admonishing defendants in this manner, it would make it "virtually impossible" for a defendant to argue that his right to testify was usurped. *Frieberg*, 305 Ill. App. 3d at 852. In the present case, the trial court complied with the suggested admonitions in *Frieberg*.

In *People v. Phillips*, 186 Ill. App. 3d 668 (1989), the trial court had advised the jurors that they would hear evidence until 5 p.m. each day of trial. The State rested its case at 3 p.m. The trial court then advised defense counsel to call any defense witnesses. Defense counsel informed the court that the witnesses would not be available until the next day. The trial court then informed the defendant and his counsel that if the defendant wished to testify, he would have to do so that day and, if the defendant decided to not testify, the defendant would not

be permitted to change his mind and testify the next day. The defendant told the court that he did not wish to testify. After his conviction, the defendant raised on appeal the court's order that the defendant would have to testify before his defense witnesses testified. This order was contrary to *Brooks v. Tennessee*, 406 U.S. 605, 32 L. Ed. 2d 358, 92 S. Ct. 1891 (1972), which held that a defendant cannot be required to make the choice whether to testify at his trial until after all of the defense evidence has been presented.

This court found that the trial court's actions amounted to harmless error because the defendant's decision not to testify was not made as a result of the court's direction, but was made independently before the defense was to begin the presentation of its case. In the instant case, the trial court inquired of defendant's intention to testify after the defense rested and again during the jury instruction conference. There is no indication in the record before us that defendant's decision not to testify was anything other than a voluntary and informed decision on the part of defendant.

We also find guidance in several other cases. In *People v. Watkins*, 238 Ill. App. 3d 253 (1992), the trial court denied the defendant's request to reopen proofs where he sought to introduce police testimony to perfect the impeachment of a State witness. The defendant argued on appeal that this was error. In affirming the trial court's ruling, this court stated that defense counsel had failed to present an excuse as to his failure to recall the officer and further stated that the testimony the defendant wanted to impeach was "not of the utmost importance" to the defendant's case. *Watkins*, 238 Ill. App. 3d at 258.

Defendant relies heavily upon two cases for support of his argument. In *People v. Johnson*, 151 Ill. App. 3d 1049, 1053 (1987), the defendant, who had not testified at trial, rested her case because she "was incapable of testifying in her defense." The remainder of the day was spent on the instructions conference. The following morning, defense counsel sought to reopen the case so that the defendant, who was "more composed and therefore was willing to testify," could present evidence. *Johnson*, 151 Ill. App. 3d at 1053. The trial court denied the defendant's motion to reopen. This court reversed on appeal, finding that it was plausible that the defendant's decision whether to testify resulted from her emotional state, "as opposed to an intentional manipulation of the trial process." *Johnson*, 151 Ill. App. 3d at 1054.

In *People v. Figueroa*, 308 Ill. App. 3d 93 (1999), the trial court struck the defendant's testimony in its entirety due to his refusal to answer certain questions on cross-examination. After both the State and defense had rested, but prior to the instructions conference, defense counsel requested to reopen the case so that the defendant,

who was then willing to answer the State's questions, could testify. The trial court denied the motion. On appeal, this court found this denial to be reversible error because the State would not have been prejudiced by the timing of the defendant's testimony and the testimony was "of the utmost importance" to his claim of self-defense. *Figueroa*, 308 Ill. App. 3d at 104.

We find that the *Watkins*, *Johnson* and *Figueroa* cases support the trial court's denial of defendant's motion to reopen. Unlike in *Johnson*, there is no indication as to the rationale behind defendant's vacillating with respect to his decision whether to testify. The justification for defendant's repeated "change of heart" appears to be a manipulation of the trial process, which supports the trial court's ruling. See *Watkins*, 238 Ill. App. 3d at 258. Also, the record reflects that, in his answer to discovery, defendant failed to disclose to the prosecution any defense that he wished to raise at trial, including alibi or self-defense, pursuant to Supreme Court Rule 413(d) (134 Ill. 2d R. 413(d)). The Illinois Criminal Code of 1961 provides in relevant part that, "A defense of justifiable use of force, or of exoneration, based on the provisions of this Article is an affirmative defense." 720 ILCS 5/7—14 (West 1998). It is well settled in Illinois that where a defendant wishes to assert an affirmative defense, he must notify the State and the court of this fact. See, *e.g.*, *People v. Burns*, 304 Ill. App. 3d 1, 8-9 (1999).

We further note that defense counsel did not argue self-defense or alibi in their opening or closing arguments and also did not request that the jury be instructed on self-defense. As a consequence, there is absolutely no basis to believe that defendant was going to testify that he acted in self-defense or had an alibi. These facts distinguish defendant's case from the defendant's case in *Figueroa*, where the barred testimony related to the important issue of self-defense. Even accepting defendant's argument that the prejudice to the State would not have been great had defendant been allowed to reopen his case, defendant was given numerous opportunities to testify, but he chose not to.

Further, defendant failed to make the required offer of proof demonstrating the nature and character of his testimony. See *People v. Peeples*, 155 Ill. 2d 422, 457-58 (1993). "The two primary functions of an offer of proof are to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998).

The requirement of an offer of proof has been applied to a defendant's potential trial testimony. In *United States v. Taylor*, 128

F.3d 1105 (7th Cir. 1997), the defendants had been convicted of bank robbery, and on appeal defendant Robinson asserted that he was denied effective assistance of trial counsel and was prevented from testifying in his own defense. In rejecting the defendant's argument, the court of appeals found that the record indicated that it was the defendant's choice not to testify. The court continued:

"On appeal, Robinson does not describe the testimony that he would have presented had he taken the stand. This omission, coupled with the overwhelming evidence of Robinson's guilt, establishes that any error causing him not to testify was harmless beyond a reasonable doubt. *United States v. Zillges*, 978 F.2d 369, 372 (7th Cir. 1992); *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988)." *Taylor*, 128 F.3d at 1109.

Similarly, the evidence against Collier was overwhelming. Further, in order for the trial court to have found that defendant's testimony was of such importance to warrant the reopening of his case, an offer of proof should have been presented before the court ruled on his request or immediately thereafter. Given the lack of insight as to the character of his testimony and reasons for failing to present it during his case in chief, we cannot say that the trial court clearly abused its discretion when denying defendant's motion to reopen his case.

■ Finally, based upon the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), defendant contends that the trial court erred in ordering that his sentences be served consecutively.

The Illinois Supreme Court in *People v. Wagener*, 196 Ill. 2d 269 (2001), held that *Apprendi* does not apply to consecutive sentences. Thus, defendant's argument fails.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL, P.J., concurs.

JUSTICE REID, dissenting:

I dissent. A defendant's right to testify at trial is a fundamental constitutional right, as is his or her right to choose not to testify. *People v. Madej*, 177 Ill. 2d 116, 145-46 (1997); see *Rock v. Arkansas*, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987); Ill. Const. 1970, art. I, § 8. It is now generally recognized that the decision whether to testify ultimately rests with the defendant. *Madej*, 177 Ill. 2d at 146. Although it is within the discretion of the trial court to determine the

question of whether to grant a defendant's motion to reopen the proofs, a trial court should not exclude defense testimony *except in the most extreme circumstances. People v. Johnson*, 151 Ill. App. 3d 1049, 1053 (1987), citing *People v. Franceschini*, 20 Ill. 2d 126 (1960). It is important to differentiate between motions to reopen the proofs in general and those motions to reopen the proofs so that the defendant might testify in his or her own defense. There is a world of difference, in terms of the constitutional factors involved, between these two types of situations. Society's interest in the efficient administration of justice has to be balanced with a defendant's constitutional right to a fair opportunity to defend. *Johnson*, 151 Ill. App. 3d at 1054.

> "Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation.] But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Rock*, 483 U.S. at 55-56, 97 L. Ed. 2d at 49, 107 S. Ct. at 2711, quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 35 L. Ed. 2d 297, 309, 93 S. Ct. 1038, 1046 (1973).

Where a case presents no extreme circumstances justifying the exclusion of exculpatory testimony, a trial court risks abusing its discretion by denying a motion to reopen the proofs. *People v. Figueroa*, 308 Ill. App. 3d 93, 102 (1999), citing *People v. Goff*, 299 Ill. App. 3d 944 (1998). The *Figueroa* court, in discussing motions to reopen the proofs in general, identified the factors involved:

> " ' "In considering a motion to reopen proofs, a trial court should take into account various factors, including the existence of an excuse for the failure to introduce the evidence at trial, *e.g.*, whether it was inadvertence or calculated risk; whether the adverse party will be surprised or unfairly prejudiced by the new evidence; whether the evidence is of the utmost importance to the movant's case; and whether there are the most cogent reasons to deny the request." ' " *Figueroa*, 308 Ill. App. 3d at 103, quoting *People v. Watkins*, 238 Ill. App. 3d 253, 258 (1992), quoting *Hollembaek v. Dominick's Finer Foods, Inc.*, 137 Ill. App. 3d 773, 778 (1985).

While I sympathize that Collier must have caused the trial court tremendous consternation by waffling between testifying and not testifying, his right to testify is of such a constitutional magnitude that it must be considered ahead of the *Watkins* factors. Collier's constitutional rights must take precedence over those general factors that a trial court would weigh in a case where a defendant wanted to

reopen the proofs for the admission of general evidence or testimony other than his own. The decision faced by the trial court was a serious one, especially considering the fact that Collier had twice before clearly indicated he would not testify. That being said, the question becomes one of weighing the impact of allowing the defendant to testify under these particular facts and circumstances. I understand that reopening the proofs would have caused some increased work, some inconvenience and, doubtless, more than a little aggravation. However, Collier's final request to testify came before closing arguments were to be made before the jury. I presume the State's Attorney was properly prepared at the onset of trial for the possibility that Collier would take the witness stand in his own constitutionally protected defense. As such, claims by the State of potential prejudice and harm to the prosecution's case from having to delay closing arguments for the testimony and cross-examination of one more witness ring hollow. When weighed against Collier's constitutional right to testify, notions of trial court or prosecutorial convenience simply must give way. Under a different set of facts, or were this a case with more obvious evidence of duplicity or gamesmanship at the heart of a defendant's decision, I certainly recognize that a different result could be warranted. This is not such a case. I believe Collier should have been allowed to testify because his constitutional rights outweighed the trial court's other concerns.